RICHARD A. SCHNURR ARDC No. 6181372
Email: Richard.Schnurr@Icemiller.com
BRIAN J. LUM ARDC No. 6256315
Email: Brian.Lum@Icemiller.com
ICE MILLER LLP
200 West Madison Street, Suite 3500
Chicago, IL 60606
Telephone: (312) 726-1567
Facsimile: (312) 726-7102

JOHN WYNNE (SBN 83041)
Email: wynne@dsmwlaw.com
DUCKOR SPRADLING METZGER & WYNNE
3043 4th Avenue
San Diego, CA 92103
Telephone: (619) 209-3000
Facsimile: (619) 209-3043

Attorneys for Defendant,
SIGNET ARMORLITE, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL ZEISS VISION INTERNATIONAL GMBH and CARL ZEISS VISION INC., <br><br> Plaintiffs, <br><br> vs. <br><br> SIGNET ARMORLITE, INC., <br><br> Defendant. | Case No. 07 CV 0894 DMS (POR) <br><br> SIGNET ARMORLITE'S OPENING CLAIM CONSTRUCTION BRIEF <br><br> Date: April 21, 2008 <br> Time: 9:00 a.m. <br> Judge: Honorable Dana M. Sabraw <br> Courtroom: |
| SIGNET ARMORLITE, INC., <br><br> Counterclaim-Plaintiff, <br><br> vs. <br><br> CARL ZEISS VISION INTERNATIONAL GMBH, CARL ZEISS VISION INC., CARL ZEISS STIFTUNG and CARL ZEISS AG, <br><br> Counterclaim-Defendants. | Complaint Filed: May 17, 2007 <br> Trial Date: April 27, 2009 |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................. 1

II.  PRINCIPLES OF CLAIM CONSTRUCTION ................................................. 1

III.  THE PATENT-IN-SUIT ......................................................... 3

IV.  SIGNET ARMORLITE'S PROPOSED CLAIM CONSTRUCTIONS ........................... 6

    A.  "prescription surface" ....................................................... 6

    B.  "individually optimized in order to fulfill all individual requirements of a prescription for spectacles excluding 0 diopters, including spherical, astigmatic or prismatic power and distribution of said requirements over said prescription surface" ........................................................... 8

    C.  "excluding zero diopters" ................................................. 16

    D.  "astigmatism" ............................................................ 18

    E.  "distribution of said requirements over said prescription surface" ................... 20

    F.  "individual distance of a wearer's pupils from each other is taken into account in an optimization calculation" ............................................. 21

    G.  "semi-finished lenses" .................................................... 23

    H.  "with a few different radii" ............................................... 24

    I.  "matching all individually required dioptric power, excluding 0 diopters, at a back surface of said spectacle lens" .......................................... 25

    J.  "carrying out at least one individual optimization for a wearer of a spectacle lens on said back surface so that sphere, astigmatism, and prism dioptric prescription values are established at all points on said back surface" ............. 28

    K.  "at all points on said back surface" ........................................ 31

V.  CONCLUSION ................................................................. 32

SIGNET ARMORLITE'S OPENING CLAIM CONSTRUCTION BRIEF  Case No. 07 CV 0894

# TABLE OF AUTHORITIES

**CASES**

Page

*Alza Corp. v. Mylan Labs., Inc.*, 310 F. Supp. 2d 610 (D. Vt. 2004) ............................ 9

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000) ................. 11

*Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258 (Fed. Cir. 2001) ............................................. 26

*Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328 (Fed. Cir. 2000) ........................ 2, 12, 32

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311 (Fed. Cir. 2001) ................. 22, 28, 30

*Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369 (Fed. Cir. 1999) ................. 8

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005) .................... 9

*Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359 (Fed. Cir. 2004) ........................... 2

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ............................... 1

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) .......... 1, 2, 3, 18, 28

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545 (Fed. Cir. 1996) ............... 27

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .................................. 2, 3

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ............... 1

*Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) .................... 2

*Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) ............ 2

*The Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985) ................... 2

**STATUTES**

Patent Local Rule 4.4 ................................................................. 1

Patent Local Rule 4.1e. .............................................................. 1

Patent Local Rule 4.2 ................................................................. 1

- iii -

# I. INTRODUCTION

Defendant, Signet Armorlite, Inc. ("Signet Armorlite"), respectfully submits its Opening Claim Construction Brief pursuant to Patent Local Rule 4.4 and the Court's Order dated September 5, 2007.

Plaintiffs, Carl Zeiss Vision International GmbH and Carl Zeiss Vision Inc. (collectively, "Zeiss"), have alleged Signet Armorlite's infringement of U.S. Patent No. 6,089,713 ("the '713 patent"). In particular, Zeiss has asserted infringement of claims 1 and 5-8 of the '713 patent. Pursuant to Patent Local Rule 4.1e., the parties have met and conferred for purposes of narrowing the issues regarding claim construction, and have stipulated to the construction of a number of claim limitations. Pursuant to Patent Local Rule 4.2, the parties filed their Joint Claim Construction Worksheet, Joint Claim Construction Chart and Joint Hearing Statement on March 4, 2008.

# II. PRINICPLES OF CLAIM CONSTRUCTION

Claim construction is a legal question "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). In construing the claims, the court must first consider the intrinsic evidence -- i.e. "The claims, the specification, and the prosecution history." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The initial inquiry "begins and ends in all cases with the actual words of the claims." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). The words of a claim are to be given their "ordinary and accustomed meaning" "absent a special and particular definition created by the patent applicant." *Id.* at 1248. The "ordinary and customary" meaning is "the meaning that the term would have to a person of

- 1 -

ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

The court must also consider the patent specification and the prosecution history. *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history.") In particular, the specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d. at 979. See, e.g., *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) (inventor's own definition of claim term in the specification held to be a limitation of the claims). Thus, the specification is "the primary basis for construing the claims." *The Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). See also, *Phillips*, 415 F.3d at 1317 ("It is … entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims.")

Similarly, "the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). The prosecution history "consists of the complete record of the proceeding before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[E]xplicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim." *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) ("by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover.") See also *Kinik*, 362 F.3d at 1365 ("claims cannot be

- 2 -

1  construed as encompassing the prior art that was distinguished in the specification and

2  disclaimed during prosecution.")

3      If the meaning of the claims cannot be resolved after consideration of the intrinsic

4  evidence, the court may also "rely on extrinsic evidence, which 'consists of all evidence external

5  to the patent and prosecution history, including expert and inventor testimony, dictionaries, and

6  learned treatises.'" *Phillips*, 415 F.3d at 1317, quoting, *Markman*, 52 F.3d at 980. Such

7  extrinsic evidence may be used to "explain scientific principles, the meaning of technical terms,

8  and terms of art that appear in the patent and prosecution history [and] may demonstrate the state

9  of the prior art at the time of the invention." *Markman*, 52 F.3d at 980. In particular, the Federal

10  Circuit "has especially noted the help that technical dictionaries may provide to a court [because]

11  those resources have been properly recognized as among the many tools that can assist the court

12  in determining the meaning of particular terminology to those of skill in the art of the invention."

13  *Phillips*, 415 F.3d at 1318.

14      In construing the claims, the court is free to consider all intrinsic and extrinsic evidence.

15  "[T]here is no magic formula or catechism for conducting claim construction. Nor is the court

16  barred from considering any particular sources or required to analyze sources in any specific

17  sequence, as long as those sources are not used to contradict claim meaning that is unambiguous

18  in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324.

19  **III.    THE PATENT-IN-SUIT**

20      U.S. Patent No. 6,089,713 (attached as Exhibit A) discloses variable refractive value

21  spectacle lenses that are produced "according to the individual requirements of the wearer" (Ex.

22  A, col. 2, lines 48-49, Fig. 3, item #1). The front side of the lens "always has a spherical surface,

23  or a simple rotationally symmetrical aspheric surface" (Ex. A, col. 3, lines 2-5 and Fig. 3, item

24                                          - 3 -

25

26

1  #2). The back side (or eye side) of the lens is a "multifocal prescription surface" that provides

2  the prescribed correction requirements for sphere, astigmatism and prism, combined with a

3  multifocal surface that provides correction for near and far vision with "a smooth transition"

4  between the near and far vision regions of the lens. (Ex. A, col. 1, lines 13-19; col. 3, lines 7-10,

5  and Fig. 3, item #3). Such multifocal surfaces are also sometimes called multiple power surfaces

6  or progressive surfaces. (Ex. A, col. 1, lines 21-24; col. 2, lines 38-41.)

7      Multifocal refractive lenses of this type have inherent aberrations in the middle region of

8  the lens between the upper distant or far viewing region of the lens and the lower reading or near

9  region due to the constant change in power of the lens in the middle region, and "[i]mage defects

10  are achieved compulsorily at the passage between the near and far regions" (Ex. A, col. 5, lines

11  14-16). Thus, the prescription surface is "individually optimized" to minimize the "image

12  defects" and "distribute them over the glass favorably" (Ex. A, col. 5, lines 15-17). The

13  prescription surface is individually optimized to fulfill all individual requirements of the wearer's

14  prescription by modifying a "predefined starting surface design" using "target functions for

15  sphere, astigmatism and prism, or functions derived from these, and their weighting" (Ex. A, col.

16  3, lines 38-40), so the target prescription requirements are "attained in the sense of a best fit"

17  (Ex. A, col. 4, lines 53-58).

18      The lenses are "produced from semi-finished [lens blanks] with spherical, or rotationally

19  symmetrical aspheric, convex front surfaces and with about 10 different radii" (Ex. A, col. 3,

20  lines 65-67). The individually optimized back side "prescription surface" is shaped as an

21  "optical free form surface" (Ex. A, col. 6, lines 38-39) by direct CNC machining, such as "direct

22  processing with Fast-Tool-Servo" (Ex. A, col. 1, line 55).

23

24                                            - 4 -

25  _____

26

The '713 patent contains 8 claims, of which claims 1 and 5-8 are at issue in this case. Claims 1, 6 and 8 are independent. Claims 1 and 8 are directed to a spectacle lens having an "individually optimized" "back surface." The language of claims 1 and 8 are identical except for a single word -- "multifocal surface without point symmetry *or* axial symmetry" (claim 1) versus "multifocal surface without point symmetry *and* axial symmetry" (claim 8). Claim 6 is directed to a process for making a lens, including the step of "matching all individually required dioptric power ... at a back surface."

The '713 patent's text cites to four prior art patents and publications relating to multifocal ophthalmic lenses. The '713 patent distinguishes its claimed invention from two of those prior art references by stating that the references do not disclose "optimizing the [multifocal] surface for individual circumstances," (Ex. A, col. 2, lines 1-17), or "matching the individual use situation" (Ex. A, col. 2, lines 18-34). With respect to the other cited art, the '713 patent states that these two other prior art patents disclose that the multifocal surface is located on the front surface of the lens. (Ex. A, col. 2, lines 38-44). One of those prior art references, U.S. Patent No. 5,444,503 owned by Zeiss, is also described as having a front side progressive surface and a separate prescription surface located on the other (back) side of the lens. (Ex. A, Col. 2, lines 34-36).

During the prosecution of the '713 patent (application No. 09/008,260), all claims were rejected over other prior art cited by the Examiner. In particular, the Examiner stated that:

> Kelch et al. ('343 teaches (col. 1, lines 11-21) that the multifocal surface can be on the eye side. Note, Shiryanagi (col. 8, lines 47-51) which also teaches that the multifocal surface can be on the eye side. If the prescriptive requirement of the wearer is 0 diopters for spherical distance, both references would meet the claimed limitation "fulfill all requirements of a prescription." (Ex. P at 2.)

- 5 -

In response, the claims were amended, *inter alia*, so that all claims contained the limitation "excluding 0 diopters" (Ex. F at 3). The Examiner subsequently allowed the claims on the following grounds:

> The prior art fails to teach a combination of all of the claimed features presented, for example, in independent claims 1, 6 and [8], which include a spectacle lens having a spherical or rotationally symmetrical aspheric front surface and a back surface that serves as a prescription surface and is individually optimized in order to fulfill all individual requirements of a prescription for spectacles, excluding 0 diopters, including spherical, astigmatic or prismatic power and distribution of the requirements over the prescription surface, the back surface having a multifocal surface without point symmetry and/or axial symmetry. (Appl'n No. 09/008,260: Exam'r Amend. and Statement of Reasons for Allowance 2/25/00, Ex. B at 2-3.)

No response was filed by Zeiss to the Examiner's Statement of Reasons for allowance.

## IV.   SIGNET ARMORLITE'S PROPOSED CLAIM CONSTRUCTIONS

Plaintiffs have alleged infringement of claims 1 and 5-8 of the '713 patent. At issue are the meanings of the following claim limitations:

### A.   "prescription surface"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| a back surface that serves as a **prescription surface** and | Plain meaning to one of ordinary skill in the art. | **"prescription surface"**: The back surface of the lens that is shaped so that the lens fulfills all requirements of the prescription of the individual wearer, including spherical, astigmatic and prismatic power and their distribution in x and y coordinates over the lens. |

Claims 1 and 8 recite the limitation of a spectacle lens having a "back surface" that is a 'prescription surface." The parties agree that the term "back surface" should be construed to mean " the surface of the lens facing toward the wearer's eye."

Signet Armorlite submits that the proper construction of the term "prescription surface" is: "the back surface of the lens that is shaped so that the lens fulfills all requirements of the

- 6 -

1    prescription of the individual wearer, including spherical, astigmatic and prismatic power and

2    their distribution in x and y coordinates over the lens." Zeiss offers no construction.

3         Signet Armorlite's proposed construction of the term "prescription surface" is expressly

4    supported by the intrinsic and extrinsic evidence. Claims 1 and 8 recite that the back surface of

5    the lens "fulfill[s] all individual requirements of a prescription for spectacles ... including

6    spherical, astigmatic or prismatic power and distribution of said requirements over said

7    prescription surface." The specification of the '713 patent similarly describes the "prescription

8    surface" as:

9         All individual requirements of a prescription for spectacles consisting of
          spherical, astigmatic and/or prismatic power and their distribution over the
10        prescription surface of the spectacle lens are fulfilled on the back surface .... (Ex.
          A, col. 2, lines 55-59.)

11

12        [A]ll the individual requirements of the prescription for spectacles, consisting of
          spherical, astigmatic and prismatic action and their distribution in x and y over the
13        spectacle lens, are fulfilled by the prescription surface. (Ex A., col. 3, lines 17-
          21.)

14        This construction is also supported by the extrinsic evidence of technical dictionaries,

15   which define a "prescription" as comprising spherical, astigmatic (cylinder) and/or prismatic

16   power and other components.

17        *lens, prescription* An ophthalmic lens manufactured to the wearer's individual
          refractive needs; refractive power is specified in diopters. (*Dictionary of*
18        *Ophthalmic Optics* (1995), Ex. C at 172.)

19        *prescription, ophthalmic* The formula determined by an examiner to correct
          refractive anomalies in an individual patient, usually containing sphere power,
20        cylinder and prism powers, and their direction as indicated. Other special
          instructions are part of the prescription... (*Dictionary of Ophthalmic Optics*
21        (1995), Ex. C at 240-41.)

22        "*prescription* ... A spectacle prescription may include a spherical component
          (often called the **spherical error**), a cylindrical component (often called the
23        **cylindrical error**), a prismatic component, an addition for near vision and the

24                                          - 7 -

25

26

interpupillary distance... (*Dictionary of Optometry And Visual Science*, 5th ed. (2000), Ex.D at 244-45.)

**B.** **"individually optimized in order to fulfill all individual requirements of a prescription for spectacles excluding 0 diopters, including spherical, astigmatic or prismatic power and distribution of said requirements over said prescription surface"**

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| is **individually optimized** in order to fulfill all **individual requirements** of a **prescription** for spectacles **excluding zero diopters**, including spherical, **astigmatic** or prismatic power and **distribution of said requirements over said prescription surface** | "Optimized" has a plain meaning to one of skill in the art; it is a mathematical calculation which begins with a starting design and modifies the starting design to better satisfy target functions or target data.<br><br>"Individually optimized" means the back surface is custom designed using a calculation which employs prescription requirements of the individual, the spherical shaped side, and a starting design and which produces an optimized design fulfilling the individual's prescription requirements on the lens back surface. | The back surface is shaped as the result of a best fit solution to all requirements for the individual wearer, including the prescribed spherical, astigmatic or prismatic power and their distribution over the lens, by modifying a predefined starting surface using a series of mathematical calculations and optical evaluations at a number of points on the surface, the mathematical calculations comprising target functions and weighting functions of spherical, astigmatic or prismatic power; but not including the case where the prescribed spherical, astigmatic or prismatic power is zero. |

Claims 1 and 8 recite the limitation of a lens having a back surface that is "individually optimized." The claims further provide a functional definition of the term "individually optimized," stating that the purpose of individual optimization is "to fulfill all individual requirements of a prescription for spectacles" (Ex. A, claims 1, 8). By itself, the term "individually optimized" is vague and indefinite, and cannot be meaningfully construed separately from the purpose or target of optimization. See *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction ... demands interpretation of the entire claim in context, not a single element in isolation."). Thus, the term

- 8 -

1  "individually optimized" must be interpreted in the context of the limitation as a whole -- i.e.

2  "individually optimized *in order to fulfill all individual requirements of a prescription for*

3  *spectacles excluding zero diopters, including spherical, astigmatic or prismatic power and*

4  *distribution of said requirements over said prescription surface*" (claims 1, 8) (emphasis

5  added).

6       In view of the intrinsic evidence of the claim language, specification and prosecution

7  history and the extrinsic evidence cited below, Signet Armorlite submits that the proper

8  construction of the term "individually optimized" is: "the back surface is shaped as the result of a

9  best fit solution to all requirements for the individual wearer, including the prescribed spherical,

10  astigmatic or prismatic power and their distribution over the lens, by modifying a predefined

11  starting surface using a series of mathematical calculations and optical evaluations at a number

12  of points on the surface, the mathematical calculations comprising target functions and weighting

13  functions of spherical, astigmatic or prismatic power; but not including the case where the

14  prescribed spherical, astigmatic or prismatic power is zero."

15       Signet Armorlite's construction is supported by the written description of the '713 patent.

16  See, e.g., *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1076-77 (Fed. Cir. 2005)

17  (where claim terms could not be understood without reference to the written description,

18  definition is established by teaching of the specification); *Alza Corp. v. Mylan Labs., Inc.*, 310 F.

19  Supp. 2d 610, 625 (D. Vt. 2004) ("Where terms chosen by the patentee are sufficiently unclear

20  that one cannot determine the scope of the claim from the language used, statements in the

21  specification or prosecution history may be used to define the scope of the claim.") The

22  specification of the '713 patent describes the purpose of "individual optimization" as "shaping

23

24                 - 9 -

25

26

the back surface" as the result of a "calculated solution" "for the target data, so that the target

data are attained in the sense of a best fit."

> An individual optimization of the prescription surface is carried out for the target
> data, so that the target data are attained in the sense of a best fit. In the calculated
> solution, the individual portions: sphere, torus/cylinder, prism, are different in
> different regions of the spectacle lens. This property is achieved only by shaping
> the back surface. (Ex. A, col. 4, lines 53-58.)

The "calculated solution" is further explained as the modification of a "predefined starting

surface[]" using "target functions" and "weighting functions" of "sphere, astigmatism, prism"

"so that the dioptric prescription values ... are attained."

> It is advantageous if, beginning with predefined starting surfaces, an individual
> optimization of the dioptric values (sphere, astigmatism, prism) takes place on the
> surface of the spectacle lens facing the wearer's eye, wherein the target functions
> for sphere, astigmatism and prism, or functions derived from these, and their
> weighting, are chosen depending upon the results obtained in designing the
> predefined starting surfaces. (Ex A, col. 3, lines 35-42.)

> It is advantageous if, starting from a previously determined starting surface, an
> individual optimization of the free-form surface is carried out, so that the dioptric
> prescription values (sphere, astigmatism, prism) are attained at the measurement
> points. The similarity of the resulting surface to the starting surface is ensured by
> the starting surface itself, the form of the discrete or continuous target functions,
> and the discrete or continuous weighting functions. (Ex. A, col. 4, lines 6-13.)

The "target functions for sphere, astigmatism and prism, or functions derived from these, and

their weighting" are used to calculate "at least a finite number of points" on the optimized

surface, such that the determination of the entire optimized surface "can be solved using least

square errors."

> A spectacle lens is frequently optimized at a finite number of points that lie close
> enough for the design to be correct also between the points. By optimization at a
> finite number of points, the problem can be linearized, and can be solved using
> least square errors, as an over-determined system of equations. (Ex A, col. 3,
> lines 42-47.)

Claims 1 and 8 further include the limitation that the lens is "individually optimized" with respect to "all individual requirements of a prescription for spectacles *excluding 0 diopters*, including spherical, astigmatic or prismatic power" (emphasis added).  More specifically, the claims were amended to add the limitation "individually optimized" and thereafter amended again to recite the limitation "excluding 0 diopters".  (See  Ex. E, 7/2/99 Amend. and Ex. F, 2/4/00 Amend.)  Both of these amendments were made to overcome the prior art and were, as discussed in detail in Section III above, accepted by the Examiner and relied upon in his Statement of Reasons for Allowance of all independent claims 1, 6 and 8 over the cited prior art.  The '713 patent claims, therefore, must be construed narrowly.  Accordingly, the limitations "individually optimized in order to fulfill all individual requirements of a prescription" must be construed to exclude those cases where the lens is not individually optimized, and also where the prescribed "spherical, astigmatic or prismatic power" is "0 diopters."

The process of "optimization" also requires "mathematically described evaluations for the deviations from the target data of the dioptric power of the spectacle lens to be produced" (Ex. A, col. 5, lines 40-43).  The Shannon reference relied upon by Zeiss as extrinsic evidence also explains that "optimization" is not a single calculation, but is the result of an "iterative cycle" of computation and evaluation.  Cf. *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000).  (prior art cited by patentee "that sheds light on the meaning of a term … can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning").

> 5.4 Optimization Procedures.  The iterative cycle used by lens design programs
> for optimization is divided into four parts.  The first step is the computation of
> derivative increments linking the changes in the lens parameters to each of the
> aberrations.  The second is the construction of a derivative matrix which can be

- 11 -

solved or inverted to provide a vector in the variable pointing toward the desired solution, with a low probability of providing a divergent process. The matrix is then solved for a new solution vector. The last step is the determination of the best possible solution based on the merit function that can be squeezed out without recomputation of the derivate matrix. (R. Shannon, *The Art and Science of Optical Design*, (Cambridge University Press 1997): Ex.G at 348-49.)

Pursuant to the teaching of Shannon, the first step of optimization is to perform a "computation" linking "changes in the lens parameters" -- i.e. the modification of a "predefined starting surface[]" using "target functions" and "weighting functions" of "sphere, astigmatism, prism" as described in the '713 patent. (Ex A, col. 3, lines 35-42; col. 4, lines 6-13.) Steps 2 and 3 of Shannon required the "construction of a derivative matrix" which is solved to provide a "vector" that "points toward the desired solution" -- i.e. evaluating whether the modification of the "predefined starting surface[]" brings you closer or farther way from attaining the "dioptric prescription values (sphere, astigmatism, prism)." (Ex. A, col. 4, lines 6-13.) Step 4 of Shannon requires the determination whether the "best possible solution" has been obtained -- i.e., whether the "target data are attained in the sense of a best fit." (Ex. A, col. 4, lines 53-58.) These steps are performed in an "iterative cycle" until the solution cannot be improved.

The '713 patent discloses that, with respect to multiple refractive surface spectacle lenses, many such lenses are not within the scope of their claimed invention. As shown below, Hof et al. stress in their patent text that it is the individual use requirements of the individual wearer that are to be included in their claimed individual optimization approach, including how the lens is worn by the wearer and optical evaluations of that as worn position in determining resultant refractive vision correction provided by the lens and whether optimization has been achieved. The Court may properly consider such disclaimers of claim scope in determining the proper construction of the claims. See *Cultor*, 224 F.3d at 1331.

- 12 -

For example, at Col. 1, lines 43-53, Hof et al. state that the multiple refraction design conformation shown in their prior art Kelch et al. patent, U.S. Patent No. 5,444,503, shows that optimal correction results only for the initial design conformation, and that use of the multiple refraction surface with a prescription surface that deviates from that design conformation causes image quality to be forfeited. Review of Kelch '503 shows that its initial design conformation refers to a front side multifocal surface created from an average use situation, (Ex. H, Kelch '503 at Col. 2, lines 11-61). Kelch et al. go on to state that it is the individual use situation that must be utilized to create its individually optimized lens by employing a back side prescription surface, including consideration of the position of the lens with respect to the wearer in terms of distance between the back side of the lens and the wearer's eye (cornea vertex distance), forward inclination of the frame (frame tilt or pantascopic tilt), and shape of the frame. (Ex. H, '503 patent at Col.2, line 62-Col. 3, line 10). Hof et al. basically adopt verbatim these individual use factors in describing these individual requirements for their special optimized lens. (Cf. Ex. A, Col. 5, lines 21-30). Hof et al. employ these same individual use factors in the sole example in their patent. (See Ex. A, Col. 6, line 65-Col. 8, line 8.)

In the '713 patent-in-suit, Hof et al. further emphasize that their claims do not cover multifocal lenses having a combined back-surface progressive and astigmatism correcting surface unless such back surfaces are individually optimized for individual circumstances (See Ex. A, col. 2, lines 1-17 distinguishing the prior art Kanolt USP Patent No. 2,878,721), or are surfaces that are matched to such individual use situations (See Ex. A, col. 2, lines 18-34 distinguishing the prior art Tagnon US Patent No. 3,722,986)[1].

---

[1] This construction of the '713 patent claims is also supported by the textbook of Signet Armorlite's expert, Professor Jalie, cited by Zeiss for other purposes. At pages 534-35 of that 1988 reference there is shown a prior art multifocal lens having a progressive surface located on

- 13 -

1       Review of pertinent extrinsic evidence from Zeiss and others further supports the proper

2    claim construction of "individually optimized to fulfill all individual requirements of a

3    prescription" and "matching all individually required dioptric power" as requiring consideration

4    of the "individual use" or "as worn" position of the lens in the optimization calculation and the

5    optical evaluation of each calculation to determine if individual optimization has been achieved.

6    For example, Exhibit I is an on-line Power Point Seminar presentation posted by Zeiss on its

7    website for the public.  Therein Zeiss describes the Ideal Progressive Lens... the Gradal

8    Individual® lens, a lens identified by Zeiss as covered by the claims of the '713 patent in the

9    Zeiss Preliminary Infringement Contentions in this action.  In the Seminar materials, Zeiss

10   clearly state that the design requirements of the individually optimized lens require consideration

11   of the as worn factors including cornea vertex distance and frame tilt. (See Ex. I at pages 2-5,

12   11-12.) Zeiss further exemplifies therein the negative effect on vision quality if such factors are

13   not included in the optimization protocol.  Zeiss presents diagrams showing optical evaluations

14   and changes to the lens in terms of power and cylinder.  These changes were caused by changes

15   in the individual use requirements of the individual wearer.  These effects are similar to the

16   negative effect disclosed in Kelch '503 for lenses to which an individual prescription is added

17   before they are subjected to "opposite surface" optimization according to the '503 patent's

18   protocol. (See, e.g. Figs 3a,b, 4a,b and 5b,c of Kelch '503, and compare Hof et al.'s comments at

19   Col. 1, lines 44-53 regarding the Ex. H, Kelch '503 patent and "forfeiting image quality" with

20   page 6 of Exhibit I-- "**Any** deviation from the **optimum** vertex distance, pantoscopic angle, near

21   working distance ..on which the fundamental progressive design was formulated, will result in a

22   **loss** in patient visual acuity")(emphasis in original).  Zeiss go on to state in their Seminar

23

the eye side of the lens together with a non-rotationally symmetric aspheric surface.  That lens,

24   the Atoral lens, is described as having been offered for sale in 1970.  (See Ex. M, pp 533-534.)

- 14 -

25

26

materials that the design requirements for optimized patient prescription require incorporation of individual patient data in the form of cornea vertex distance, pantoscopic angle, pupillary distance and near working distance in the prescription (Rx) calculation. (See Ex. I, pages 11-12.)

Zeiss include in their publicly distributed Fitting Guide for their Gradal Individual® FrameFit™ lenses instructions that the eye care professional measure and provide these same individual use requirement data, including cornea vertex distance and frame inclination, so that the lens can be made. (See Ex. J, Steps 5 and 6.) Zeiss also include their Gradal Individual® lenses in their on-line Glossary under the term "Optimization" as follows: "Mathematical calculation of the progressive lens design on the basis of certain specifications in the individualized progressive lenses. In Gradal Individual®...not only the power of the lens, but also additional parameters of the wearer PD (pupillary distance), BVD [back vertex distance or cornea vertex distance], pantoscopic angle, near object distance) are taken into account." (See Ex. K.)

Finally, third party publications contemporaneous to the '713 patent further support Signet Armorlite's claim construction concerning individual optimization to fulfill all the individual requirements of the wearer and matching all individually required dioptric power as necessarily including optimization that takes into account the "individual use" or "as worn" position of the lens. (See Ex. L, State of the Art Optimization of Progressive Lens Design at pages SAI 002587-90.) That 2000 article discloses the optical effect of use of average values in progressive lens design such as PD, cornea vertex distance, pantoscopic tilt of the frame and frame arching (See Ex. L at SAI 002587 for illustration of individual parameters), and how the "as worn" lens individual parameters must be included in the lens design optimization protocol to provide a truly individually optimized multifocal lens. (See Ex. L at SAI 002588-90).

- 15 -

Thus, the "individual requirements" of the wearer's prescription, and the wearer's "individually required dioptric power" must be obtained by individual optimization that takes into account the as worn position of the lens by that wearer, as well as the wearer's prescribed sphere, cylinder or prism values. Further, those individual requirements of the wearer must be used in a series of mathematical calculations and optical evaluations to determine whether the modifications of the starting surface has been achieved in the resultant lens in terms of the best fit of that lens to all the requirements of the individual wearer, and not simply an improvement of some aspect of the lens, as a position now asserted but was previously disclaimed by Zeiss.

### C.    "excluding zero diopters"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| **excluding zero diopters** | Plain meaning to one skilled in the art. A "diopter" is a unit for specifying the power of a spectacle lens. It is the reciprocal of the focal length in meters. | **"excluding zero diopters":** Signet Armorlite asserts that the term "excluding zero diopters" is properly construed in the context of the limitation as a whole. See above.<br><br>**"diopter":** A unit of measurement of the refractive power of a lens (spherical and astigmatic power), or of the deviation of light by a lens (prismatic power). |

Claims 1, 6 and 8 recite the limitation "excluding 0 diopters." As discussed in detail above (Section IV.B.) Signet Armorlite submits that the term "excluding 0 diopters" is properly construed as excluding those cases where the prescribed "spherical, astigmatic or prismatic power" is "0 diopters." Zeiss does not offer a construction of this limitation.

- 16 -

In addition, Signet Armorlite submits that the proper construction of the term "diopter" is: "a unit of measurement of the refractive power of a lens (spherical and astigmatic power), or of the deviation of light by a lens (prismatic power)."

Signet Armorlite's proposed construction of the term "diopter" is amply supported by the extrinsic evidence of technical dictionaries. "Diopter" is a technical term for the unit of measurement of the spherical, astigmatic or prismatic power of a lens. Lenses having spherical or astigmatic power result in the convergence of light rays to a focal point (or divergence of light rays).

> *power, dioptric* The ability of a lens or lens system to change the vergence of incoming light rays. Unit dioptric power is the reciprocal of the secondary focal length of a lens of 1 meter focus .... (*Dictionary of Ophthalmic Optics* (1995), Ex. C at 235.

> *dioptre* 1. A unit proposed by Monoyer to evaluate the **refractive power** of a lens or of an optical system. It is equal to the product of the refractive index in the image space and the reciprocal of the focal length in metres. (*Symbol*: D.) Thus a lens with a focal length (in air) of 1 m has a power of 1 D .... (*Dictionary of Optometry and Visual Science*, 5th ed. (2000), Ex. D at 77.) (Emphasis in original.)

Accordingly, "Diopter" units correspond to the reciprocal of the focal length of the lens when used in the context of spherical or astigmatic power.

In contrast to spherical and astigmatic power, lenses having prismatic power result in the deviation or bending of a pencil of light.

> *diopter, prism* An optical unit of measurement used to express the angle of deviation of a ray of light by a prism or lens. One prism diopter (Δ) will deviate parallel rays of light 1cm at a distance of 1m. Prism power in these units is measured as the displacement of the ray, in centimeters, perpendicular to its line of incidence at a distance of 1m. The symbol (Δ) is used to designate the prism diopter. (*Dictionary of Ophthalmic Optics* (1995), Ex. C at 88.)

> *dioptre, prism* 1. A unit specifying the amount of light deviation by an ophthalmic prism. One prism dioptre (written 1 Δ) represents a deviation of 1 cm on a flat surface 1 m away from the prism. The surface is perpendicular to the direction of

- 17 -

the original light ray .... (*Dictionary of Optometry and Visual Science*, 5th ed. (2000), Ex. D at 78.

Accordingly, "Diopter" units correspond to the amount of deviation of light when used in the context of prismatic power.[2]

In the claims 1 and 8 of the '713 patent, the term "excluding 0 diopters" is used in the context of spherical, astigmatic and prismatic power:

> ... all individual requirements of a prescription for spectacles excluding 0 diopters, ***including spherical, astigmatic or prismatic power*** .... (Ex. A, Claims 1, 8.) (Emphasis added.)

Claim 6 similarly recites "matching all individually required dioptric power, excluding 0 diopters" (Ex. A, Claim 6). In the specification of the '713 patent, the term "dioptric power" is used synonymously with spherical, astigmatic and prismatic power -- e.g. "dioptric power (spherical, astigmatic and prismatic)" (Ex. A, col. 1, lines 30-31).

Thus, as used in the claims of the '713 patent, the term "diopter" must be construed in the context of sphere, astigmatism and prism, and the claims construed to exclude "zero diopters" of any of those values from the scope of the claims. To find otherwise would destroy the objective notice purpose of the claims. *Markman*, 52 F.3d at 978-79.

### D. "astigmatism"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| including spherical, **astigmatic** or prismatic power and | Plain meaning to one skilled in the art.<br><br>As to "astigmatism:" Many eyes suffer from the defect of astigmatism. The astigmatic eye | **"astigmatic":** The unequal refraction of light in different meridians by a lens, in which the image of a point object is focused as two line images at different distances from the lens. |

---

[2] Contrary to Zeiss' assertion, page 5 of the Jalie book clearly discloses that the reference there is to a spherical lens. At page 67 of the same publication Professor Jalie explains the diopter for prism in the same type of units described above in Signet Armorite's cited technical dictionaries. (See Ex. N, page 67.)

- 18 -

| | needs a correcting lens whose power varies in different meridians. Such a correction is sometimes called a "cylinder" correction or requirement.<br><br>The back surface copes with all the individual requirements namely the progressive or multifocal requirements as well as necessary cylindrical (astigmatic) requirements and possible prismatic values prescribed for the wearer of the lens. | |
|---|---|---|

Claims 1, 7 and 8 each recite the limitation of "astigmatic ... power" (claims 1, 8) or "astigmatism" (claim 7).

Signet Armorlite submits that the proper construction of the term "astigmatism" is: "The unequal refraction of light in different meridians by a lens, in which the image of a point object is focused as two line images at different distances from the lens."

Signet Armorlite's proposed construction is amply supported by the extrinsic evidence of technical dictionaries.

> *astigmatism* An imperfect condition of refraction in which rays emanating from a single luminous point are not focused at a single image point in an optical system, but instead are focused as two line images, generally at right angles to each other and at different distances from the object point. In the eye, a refractive defect due to unequal refraction of incident light by the dioptric system, in different meridians." (*Dictionary of Ophthalmic Optics* (1995), Ex. C at 24-25.)

> *astigmatism* A condition of refraction in which the image of a point object is not a single point but two focal lines at different distances from the optical system. The two focal lines are generally perpendicular to each other." (*Dictionary of Optometry and Visual Science*, 5th ed. (2000), Ex. D at 28.)

Thus, the term "astigmatism" or "astigmatic power" refers to the condition where light is focused as "two line images" in different meridians (e.g., "at right angles to each other") and at different distances from the "optical system" (i.e. lens or eye).

- 19 -

## E. "distribution of said requirements over said prescription surface"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| **distribution of said requirements over said prescription surface** | Plain meaning to one skilled in the art.<br><br>The distribution of the individual requirements over the back surface is fulfilled by forming the back surface in accordance with the individually optimized design. | The distribution of all requirements of the individual wearer's prescription, including spherical, astigmatic or prismatic power, at a number of points over the back surface in addition to the near and far reference points. |

Claims 1 and 8 recite the limitation of the "distribution of said requirements over said prescription surface."

Signet Armorlite submits that the proper construction of the term "distribution of said requirements over said prescription surface" is: "the distribution of all requirements of the individual wearer's prescription, including spherical, astigmatic or prismatic power, at a number of points over the back surface in addition to the near and far reference points."

Signet Armorlite's proposed construction is supported by the specification of the '713 patent. As shown by the sole example provided in the '713 patent, a prescription for spectacles includes the values for sphere, astigmatism and prism at the "far and near reference points" (Ex. A, col. 7, lines 18-20). Thus, individual optimization is used to establish the values for the "requirements of a prescription for spectacles ... including spherical, astigmatic or prismatic power" (claims 1, 8) that "deviate" from the far and near reference points.

> Spectacle lenses are described, in present terminology, by those values for sphere, astigmatism and prism that the lens achieves at the far and near distance points. Values that deviate from these can be established at all other points of the spectacle lens, so that the dioptric power can be described by functions in x and y coordinates. (Ex. A, col. 1, lines 37-42.)

- 20 -

**F.**  **"individual distance of a wearer's pupils from each other is taken into account in an optimization calculation"**

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| wherein an **individual distance of a wearer's pupils from each other** is **taken into account in an optimization calculation** | "Optimization" has a plain meaning to one skilled in the art; it is a mathematical calculation which begins with a starting design and modifies the starting design to better satisfy target functions or target data.<br><br>The "distance" is specified in the art as "PD" or pupillary distance. | **"individual distance of a wearer's pupils from each other"**: The distance between the centers of the pupils of the wearer; also referred to as "pupillary distance" or "PD."<br><br>**"taken into account in an optimization calculation"**: The back surface is shaped as a best fit solution to all requirements for the individual wearer, including the prescribed spherical, astigmatic or prismatic power and their distribution over the lens, and further incorporating pupillary distance as a factor in the best fit solution by modifying a predefined starting surface using a series of mathematical calculations and optical evaluations at a number of points on the surface, the mathematical calculations comprising target functions and weighting functions of pupillary distance and spherical, astigmatic or prismatic power. |

Claim 5 recites the limitation of a lens wherein the "individual distance of a wearer's pupils from each other" is taken into account. The parties agree that the claimed "distance" is also referred to as the "pupillary distance" or "PD."

Signet Armorlite submits that the proper construction of the term "individual distance of a wearer's pupils from each other" is: "the distance between the centers of the pupils of the wearer; also referred to as 'pupillary distance' or 'PD.'"

- 21 -

1     Signet Armorlite's proposed construction of the term "prescription surface" is supported

2 by the intrinsic evidence. Figure 1 of the '713 patent "shows a schematic representation of the

3 standard pupillary distance" (Ex. A, col. 4, lines 24-25; FIG. 1). A distance "$PD_1$" is shown in

4 Figure 1, that extends between the centers of the eyes and, therefore, represents the distance

5 between the centers of the pupils. As agreed by the parties, "PD" refers to the claimed

6 "individual distance of a wearer's pupils from each other."

7     Signet Armorlite further submits that the proper construction of the term "taken into

8 account in an optimization calculation" is: "the back surface is shaped as a best fit solution to all

9 requirements for the individual wearer, including the prescribed spherical, astigmatic or

10 prismatic power and their distribution over the lens, and further incorporating pupillary distance

11 as a factor in the best fit solution by modifying a predefined starting surface using a series of

12 mathematical calculations and optical evaluations at a number of points on the surface, the

13 mathematical calculations comprising target functions and weighting functions of pupillary

14 distance and spherical, astigmatic or prismatic power."

15     The same term should be construed consistently throughout the claims. *Fin Control Sys.*

16 *Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("the same terms appearing in

17 different portions of the claims should be given the same meaning unless it is clear from the

18 specification and the prosecution history that the terms have different meanings at different

19 portions of the claims"). Thus, the terms "optimization calculation" (claim 5) and "individually

20 optimized" (claims 1, 8) should have essentially the same construction, except that "an

21 individual distance of the wearer's pupils from each other" is an additional factor in the

22 "optimization" set forth in claim 5.

23

24                                      - 22 -

25

26

### G.    "semi-finished lenses"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| employing **semi-finished lenses** | "Semifinished lenses" means lens blanks in which one face is a finished surface and the other face is unfinished. | **"semi-finished lenses":** An ophthalmic lens of which only one surface is completely polished and the other surface can be shaped to any required curvature to achieve a given power requirement for a completed ophthalmic lens. |

Claim 6 recites the limitation of a method for making spectacle lenses comprising the step of employing "semi-finished lenses."

Signet Armorlite submits that the proper construction of the term "semi-finished lenses" is: "an ophthalmic lens of which only one surface is completely polished and the other surface can be shaped to any required curvature to achieve a given power requirement for a completed ophthalmic lens."

Signet Armorlite's proposed construction of the term "semi-finished lenses" is supported by the specification of the '713 patent, which states that:

> Spectacle lenses with multifocal power are produced from semi-finished lenses with a spherical or rotationally symmetrical aspheric front surface with a few different radii, such that the whole individual matching of required dioptric power takes place on the back surface of the spectacle lens. (Ex. A, col. 2, lines 61-65.)

Thus, the '713 patent describes the use of "semi-finished lenses" having a polished, spherical front surface and a back surface that is subsequently shaped to provide the "whole individual matching of required dioptric power." As the specification makes clear, "none of the individual requirements of the prescription for spectacles are effected on the [finished] front side of the spectacle lens" (Ex. A, col. 3, lines 25-27).

- 23 -

This construction is also supported by the extrinsic evidence of technical dictionaries, which define a "semi-finished lenses" as: "An ophthalmic lens of which only one surface is completely polished. The other surface can be surfaced to any required curvature." (*Dictionary of Optometry And Visual Science*, 5th ed. (2000), Ex. D at 169.)

## H. "with a few different radii"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| with a **few different radii**, and | Plain meaning to one of skilled in the art. A "few" is compared to the 100s of different conventional progressive front surface blanks used in the prior art; for example about 10. | **"a few different radii"**: About 10 or fewer different radii. |

Claim 6 recites the limitation of semi-finished lenses with "a few different radii." Signet Armorlite submits that the proper construction of the term "a few different radii" is: "about 10 or fewer different radii."

Signet Armorlite's proposed construction of the term "a few different radii" is supported by the intrinsic evidence. The '713 patent discloses that the inventive lenses may be produced from a limited number of semi-finished lenses having "spherical or rotationally symmetrical aspheric front surface[s]" of a "few different radii."

> Spectacle lenses with multifocal power are produced from semi-finished lenses with a spherical or rotationally symmetrical aspheric front surface with a few different radii, such that the whole individual matching of required dioptric power takes place on the back surface of the spectacle lens. (Ex. A, col. 2, lines 61-65.)

The specification of the '713 patent states that lenses may be produced according to the invention using semi-finished lenses having "about 10 different radii."

> The process according to the invention for producing spectacle lenses ... are produced from semi-finished goods with spherical, or rotationally symmetrical aspheric, convex front surfaces and with about 10 different radii .... (Ex. A, col. 3, lines 61-67.)

- 24 -

Since only a limited number of front surface radii, e.g. 10, is required, individual processing machines can each be associated with a given front surface radius and can perform this section of the program. (Ex. A, col. 6, lines 33-36.)

The optical powers of a delivery program from Sph+10 dpt to-10 dpt can be accommodated in, for example, 10 regions with different deflection. This means that only 10 spherical front surfaces are required, and all the multifocal lens programs for different applications that are provided for this material can then be produced. (Ex. A, col. 6, lines 49-55.)

The '713 patent fails to teach or suggest an upper limit of the required number of different radii, nor does the '713 patent state the number of different radii required by the prior art.

## I.  "matching all individually required dioptric power, excluding 0 diopters, at a back surface of said spectacle lens"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| **matching** all individually required **dioptric power**, excluding 0 diopters, at a back surface of said spectacle lens | Matching or adjusting of a starting design to the individual prescription. Matching is done over the back surface. Matching can be attained for example by adding spherical and cylindrical surface designs to the starting progressive surface design. Matching can also be attained by "individual optimization." <br><br> As discussed above, a diopter is a unit for specifying the power of a spectacle lens. It is the reciprocal of the focal length in meters. "Dioptric power" is used to specify prescriptions for sphere and "astigmatism," discussed above. | **"matching all individually required dioptric power, excluding 0 diopters, at a back surface of said spectacle lens":** Shaping the back surface of the lens using the results of an optimization calculation to fulfill all requirements for the individual wearer, including the prescribed spherical, astigmatic or prismatic power and their distribution over the lens as a best fit solution, by modifying a predefined starting surface using a series of mathematical calculations and optical evaluations at a number of points on the surface, the mathematical calculations comprising target functions and weighting functions of spherical, astigmatic or prismatic power; but not including the case where the prescribed spherical, astigmatic or prismatic power is zero. <br><br> **"dioptric power":** The ability of a lens to change the vergence of a |

| | | beam of light (spherical and astigmatic dioptric power), or of a lens to cause the deviation of light (prismatic dioptric power). |
| | | **"diopter":** A unit of measurement of the refractive power of a lens (spherical and astigmatic power), or of the deviation of light by a lens (prismatic power). |

Claim 6 recites the limitation of "matching all individually required dioptric power, excluding 0 diopters, at a back surface of said spectacle lens."

Signet Armorlite submits that the proper construction of the term "matching all individually required dioptric power, excluding 0 diopters, at a back surface of said spectacle lens" is: "shaping the back surface of the lens using the results of an optimization calculation to fulfill all requirements for the individual wearer, including the prescribed spherical, astigmatic or prismatic power and their distribution over the lens as a best fit solution, by modifying a predefined starting surface using a series of mathematical calculations and optical evaluations at a number of points on the surface, the mathematical calculations comprising target functions and weighting functions of spherical, astigmatic or prismatic power; but not including the case where the prescribed spherical, astigmatic or prismatic power is zero."

The specification of the '713 patent repeatedly defines "matching" as forming the back surface of the lens by individual optimization. See *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("when a patentee uses a claim term throughout the entire specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'").

- 26 -

[T]he whole individually required dioptric power matching takes place on a free-form surface on the side of the spectacle lens facing the wearer's eye, and the shape of this surface results from an optimization calculation with the use of the design results as a beginning for optimization. (col. 3, line 61 - col. 4, line 5)

It is now possible to calculate a new optimization for each individual case of use. This leads to a matching of the starting surface to the individual prescription.... (col. 5, lines 6-13)

In particular, the '713 patent characterizes the invention as "matching" the prescribed dioptric power on the back surface by shaping surface as the result of an "optimization calculation" (Ex. A, col. 3, line 61 - col. 4, line 5). See *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("when the preferred embodiment is described as the invention itself, the claims are not entitled to a broader scope than that embodiment").

The process according to the invention for producing spectacle lenses with multifocal power is characterized in that ... the whole individually required dioptric power matching takes place on a free-form surface on the side of the spectacle lens facing the wearer's eye, and the shape of this surface results from an optimization calculation with the use of the design results as a beginning for optimization. (Ex. A, col. 3, line 61 - col. 4, line 5)

The similarity between the meaning of the term "matching" and the term "individually optimized" is also support by the prosecution history of the '713 patent. During the prosecution of the '713 patent, the applicant argued that the claims were patentable over the prior art because:

The prior art fails to teach a combination of all the claimed features as presented, for example, in **independent claims** 1, **6** and [8], which include a spectacle lens having a spherical or rotationally symmetrical aspheric front surface and a back surface that serves as a prescription surface and *is individually optimized in order to fulfill all individual requirements of a prescription for spectacles, excluding 0 diopters*, including spherical, astigmatic or prismatic power and distribution of the requirements over the prescription surface, the back surface having a multifocal surface without point symmetry and/or axial symmetry." (Ex. B at pp. 2-3.)(emphasis added)

- 27 -

1     As indicated above, this argument as to the patentability of claim 6 was accepted by the

2     Examiner and restated in the reasons for allowance of the claim, with no objection from Zeiss.

3     Thus, in view of the arguments made during the prosecution history, the term "matching" in

4     claim 6 necessarily encompasses the limitation "individually optimized." The public is entitled

5     to rely on the public record Zeiss created in arguing for allowance of the '713 claims in

6     determining the scope of those claims. *Markman*, 52 F.3d at 978-79.

7        Furthermore, claim 6 requires "matching" of "all individually required dioptric power,

8     excluding 0 diopters." As used in the '713 patent, the term "dioptric power" is synonymous with

9     "spherical, astigmatic and prismatic power." (See Section IV.C.) Accordingly, the construction

10     of the term "matching all individually required dioptric power" in claim 6 must be similar to the

11     construction of the term "individually optimized in order to fulfill all individual requirements of

12     a prescription...including spherical, astigmatic and/or prismatic power" in claims 1 and 8

13     because, inter alia, matching is achieved by shaping the back surface using the results of the

14     optimization calculation (see Section IV.B.). *Fin Control Sys.*, 265 F.3d at 1318. This

15     construction should also include accounting for all requirements for the individual wearer in the

16     matching/optimization process, including cornea vertex distance, frame tilt and PD data, for the

17     same reasons set out above with respect to Claims 1 and 8.

18       **J.**     **"carrying out at least one individual optimization for a wearer of a spectacle lens on said back surface so that sphere, astigmatism, and prism dioptric**

19               **prescription values are established at all points on said back surface"**

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| carrying out at least one **individual optimization** for a wearer of spectacle lens on said back surface so that | Plain meaning.<br><br>"Optimization" has a plain meaning to one skilled in the art; it is a  mathematical calculation which begins with a starting | The back surface is shaped as a best fit solution to all requirements for the individual wearer, including the prescribed spherical, astigmatic and prismatic power and their distribution over the lens, |

- 28 -

| sphere, **astigmatism**, and prism dioptric prescription values are established **at all points on said back surface** | design and modifies the starting design to better satisfy target functions or target data.<br><br>"Individual optimization for a wearer of the spectacle lens on said back surface" means the back surface is custom designed using a calculation which employs prescription requirements of the individual, the spherical shaped side, and a starting design and which produces an optimized design fulfilling the individual's prescription requirements on the lens back surface. | by modifying a predefined starting surface by performing at least one series of mathematical calculations and optical evaluations at each point on the back surface, the mathematical calculations comprising target functions and weighting functions of prescribed spherical, astigmatic and prismatic power and solutions of error integrals and methods of calculus of variation; but not including the case where the prescribed spherical, astigmatic or prismatic power is zero. |

Claim 7 recites the limitation of "carrying out at least one individual optimization" on the back surface of the lens. As discussed in detail in connection with the limitation "individually optimized" (Section IV.B.), the term "individual optimization" must be interpreted in the context of the limitation as a whole -- i.e. "carrying out at least one individual optimization for a wearer of spectacle lens on said back surface *so that sphere, astigmatism, and prism dioptric prescription values are established at all points on said back surface*" (emphasis added).

Signet Armorlite submits that the proper construction of the term "individual optimization" is: "the back surface is shaped as a best fit solution to all requirements for the individual wearer, including the prescribed spherical, astigmatic and prismatic power and their distribution over the lens, by modifying a predefined starting surface by performing at least one series of mathematical calculations and optical evaluations at each point on the back surface, the mathematical calculations comprising target functions and weighting functions of prescribed spherical, astigmatic and prismatic power and solutions of error integrals and methods of calculus of variation; but not including the case where the prescribed spherical, astigmatic or prismatic power is zero."

- 29 -

The limitation of claim 7, "individual optimization ... so that sphere, astigmatism, and prism dioptric prescription values are established" is essentially the same as the limitation of claims 1 and 8, "individually optimized in order to fulfill all individual requirements of a prescription ... including spherical, astigmatic or prismatic power." Furthermore, claim 7 depends from claim 6, which contains the limitation "excluding 0 diopters," that is also contained in claims 1 and 8. Accordingly, the construction of the term "individual optimization" in claim 7 must be similar to the construction of the term "individually optimized" in claims 1 and 8 (see Section IV.B.), including accounting for individual use, as worn factors in the optimization process. *Fin Control Sys.*, 265 F.3d at 1318.

However, claim 7 differs from claims 1 and 8 in two important respects. First, claim 7 recites "individual optimization ... so that sphere, astigmatism, *and* prism dioptric prescription values are established," whereas claims 1 and 8 recites "individually optimized in order to fulfill all individual requirements of a prescription ... including spherical, astigmatic *or* prismatic power." Thus, the construction of the term "individual optimization" (claim 7) must recite: "the back surface is shaped as a best fit solution to all requirements for the individual wearer, including the prescribed spherical, astigmatic *and* prismatic power" and "the mathematical calculations comprising target functions and weighting functions of prescribed spherical, astigmatic *and* prismatic power."

Second, "individual optimization" (claim 7) requires that "sphere, astigmatism, and prism dioptric prescription values are established **at all points** on said back surface." In contrast, "individually optimized" (claims 1, 8) does not contain this limitation and merely requires the "distribution of said requirements [spherical, astigmatic or prismatic power] over said prescription surface." Thus, the construction of the term "individual optimization" (claim 7)

- 30 -

must recite: "performing at least one series of mathematical calculations and optical evaluations *at each point* on the back surface." (See Section IV.K.)

Furthermore, the specification of the '713 patent states that optimization at all points "means that error integrals must be solved, and methods of the calculus of variation must be used" (Ex. A, col. 3, lines 47-50). Thus, the construction of the term "individual optimization" (claim 7) must recite: "the mathematical calculations comprising target functions and weighting functions of prescribed spherical, astigmatic and prismatic power *and solutions of error integrals and methods of calculus of variation*." (See Section IV.K.)

### K.    "at all points on said back surface"

| '713 PATENT | ZEISS' CONSTRUCTION | SIGNET ARMORLITE'S CONSTRUCTION |
|---|---|---|
| established at **all points on said back surface** facing a wearer's eye | Optimized at a finite number of points that lie close enough for the design to be correct between the points. | **"at all points on said back surface"**: At each point on the back surface, calculated using solutions of error integrals and methods of calculus of variation. |

Claim 7 recites the limitation of a spectacle lens where the dioptric prescription values are established "at all points on said back surface."

Signet Armorlite submits that the proper construction of the term "at all points on said back surface" is: "at each point on the back surface, calculated using solutions of error integrals and methods of calculus of variation."

Signet Armorlite's proposed construction of the term "at all points on said back surface" is supported by the intrinsic evidence. The specification of the '713 patent explicitly distinguishes between "optimization at a finite number of points" and "optimization at all points."

A spectacle lens is frequently optimized at a finite number of points that lie close enough for the design to be correct also between the points. By optimization at a

- 31 -

finite number of points, the problem can be linearized, and can be solved using least square errors, as an over-determined system of equations. It is also possible to carry out an optimization at all points. However, this means that error integrals <u>must be solved</u>, and methods of the calculus of variation <u>must be used</u>. An optimization at a finite number of points that lie close together is simpler than an optimization at all points of the surface, and provides comparable results. (Ex. A, col. 3, lines 35-53) (emphasis added.)

Thus, "optimization at a finite number of points" requires the points to "lie close enough for the design to be correct also between the points" such that the entire surface may be approximated "using least square errors." In contrast, calculation of the entire surface by "optimization at all points" requires that "error integrals must be solved, and methods of the calculus of variation must be used." Where the patent owner clearly states what is required for its claim element, that meaning must be adapted. *Cultor*, 224 F.3d at 1331.

## V.     CONCLUSION

In view of the foregoing, Defendant Signet Armorlite respectfully requests that the Court construe the asserted claims 1 and 5-8 of U.S. Patent No. 6,089,713 as set forth in this Memorandum.

Respectfully submitted,

DATED: <u>March 7, 2008</u>          <u>/s/ Richard A. Schnurr</u>
                                      Richard A. Schnurr
                                      Brian J. Lum
                                      ICE MILLER LLP


DATED: <u>March 7, 2008</u>          <u>/s/ John C. Wynne</u>
                                      John C. Wynne
                                      DUCKOR SPRADLING METZGER & WYNNE

                                      Attorneys for Defendants and
                                      Counterclaim-Plaintiffs
                                      SIGNET ARMORLITE, INC.

- 32 -