1  KARINEH KHACHATOURIAN (SBN 202634)
   Email: karineh.khachatourian@bipc.com
2  BRYAN J. SINCLAIR (SBN 205885)
   email: bryan.sinclair@bipc.com
3  BUCHANAN INGERSOLL & ROONEY LLP
   333 Twin Dolphin Drive, Suite 700
4  Redwood Shores, California 94065-1418
   Telephone: (650) 622-2300
5  Facsimile: (650) 622-2499

6  ERIC WEISBLATT (*pro hac vice*)
   Email: eric.weisblatt@bipc.com
7  BUCHANAN INGERSOLL & ROONEY PC
   1737 King Street, Suite 500
8  Alexandria, Virginia 22314
   Telephone: (703) 836-6620
9  Facsimile: (703) 836-2021

10 Attorneys for Plaintiffs and Counter-Defendants,
   CARL ZEISS INTERNATIONAL GMBH; CARL ZEISS VISION, INC.
11

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15 CARL ZEISS VISION INTERNATIONAL<br>16 GMBH and CARL ZEISS VISION INC.,<br>17         Plaintiffs,<br>18     vs.<br>19 SIGNET ARMORLITE, INC.,<br>20         Defendants.<br>21 ————————————————<br>22 AND RELATED COUNTERCLAIMS.<br>23 | Case No. 07 CV 0894 DMS (POR)<br><br>**CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Judge: Hon. Dana M. Sabraw<br><br>Complaint Filed: May 17, 2007<br>Trial Date:     April 27, 2009 |

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

      A.    CARL ZEISS VISION'S INVENTION AND ITS SIGNIFICANCE ...................1

            1.    Technical Background ................................................1

            2.    Prior to Carl Zeiss Vision's Invention, Progressive Lenses Were
                  Poorly Customized And Required Large Inventories Of Expensive
                  Semi-Finished Lens Blanks .........................................................2

                  a.    Conventional Progressive Lenses ...................................2

                  b.    The Carl Zeiss Vision Invention And Patent ...................3

      B.    GENERAL PRINCIPLES OF CLAIM INTERPRETATION APPLICABLE
            TO THE PRESENT CASE...................................................................5

II.   BASIC CLAIM TERMINOLOGY (AS TO WHICH THERE IS AGREEMENT OR
      LITTLE DISPUTE) ...........................................................................6

      A.    Spectacle Lens (Agreed) ............................................................6

      B.    Spherical . . . Front Surface (Agreed) .......................................6

      C.    Back Surface (Agreed)...............................................................6

      D.    Individual Requirements of a Prescription for Spectacles.......................7

      E.    Diopter ....................................................................................7

      F.    Spherical Power .......................................................................7

      G.    Astigmatic Power......................................................................8

      H.    Distance of a Wearer's Pupils From Each Other...........................8

      I.    Prismatic Correction .................................................................9

      J.    Multifocal (Agreed) ..................................................................9

      K.    Without Point Symmetry and/or Axial Symmetry (Agreed) .................10

III.  EXAMPLE OF A PRESCRIPTION FOR A PROGRESSIVE LENS ..............10

IV.   THE ASSERTED CLAIMS .................................................................10

V.    INTERPRETATION OF TERMS IN DISPUTE ..........................................11

      A.    Interpretation of Claim 6 Limitation:  "Matching All Individually Required

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF        CASE NO. 07 CV 0894 DMS (POR)

| | | | | |
|---|---|---|---|---|
| | | | Dioptric Power" | 11 |
| | | 1. | Matching Includes a Variety of Processes | 11 |
| | | 2. | The "Matching" of Claim 6 is Broader Than and Inclusive of the "Individual Optimization" Processes | 13 |
| | | | a. | The Claims Use Different Words | 13 |
| | | | b. | Claim 7 Treats the Individual Optimization Process as a Subset of Claim 6 Matching | 13 |
| | | | c. | The Patent Specification Discloses Different Ways of Achieving Matching | 14 |
| | | 3. | Matching is a Way of Attaining Special Optimization | 15 |
| | B. | | Interpretation of the Claim 1, 7 and 8 Limitations "Individually Optimized" or "Individual Optimization" | 15 |
| | | 1. | There Are Many Ways to Optimize | 17 |
| | | 2. | Optimization Does Not Require a "Best" Lens Design or Use of Particular Mathematical Functions, Criteria or "Weighting" | 17 |
| | | | a. | Optimization Does Not Require a "Best" Lens Design | 18 |
| | | | b. | Optimization Does Not Require Weighting or Weighting Functions | 18 |
| | C. | | Interpretation of the Claim 6 Limitation: "Semi-finished lenses having spherical . . . front surface with a few different radii" | 20 |
| | D. | | The Lack of Symmetry Limitations of Claim 1, 6 and 8 are Equivalent | 21 |
| | E. | | Interpretation of the Claim 1 and 8 Limitation: "including spherical, astigmatic or prismatic power . . ." | 23 |
| | F. | | Interpretation of the Claim 1, 6 and 8 Limitation: ". . . excluding 0 diopters . . ." | 24 |
| | G. | | Interpretation of the Claim 7 Limitation: ". . . prescription values are established at all points on said back surface . . ." | 25 |
| VI. | | | CONCLUSION | 27 |

## TABLE OF AUTHORITIES

FEDERAL CASES

Ajinomoto Co., Inc. v. Archer-Daniels Midland Co.,
        228 F.3d 1338 (Fed. Cir. 2000)...................................................................................17

Applied Materials, Inc. v. Advanced Semiconductive Materials Am.,
        98 F.3d 1563 (Fed. Cir. 1996).....................................................................................21

Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,
        796 F.2d 443 (Fed. Cir. 1986).....................................................................................21

CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.,
        224 F.3d 1308 (Fed. Cir. 2000)...................................................................................13

D.M.I. Inc. v. Deere & Co.,
        755 F.2d 1570 (Fed. Cir. 1985)...................................................................................14

Glaxo Wellcome, Inc. v. Andrx Pharmaceuticals, Inc.,
        344 F.3d 1226 (Fed. Cir. 2003)...................................................................................16

Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,
        381 F.3d 1111 (Fed. Cir. 2004)...................................................................................19

Interactive Gift Express, Inc. v. Compuserve, Inc.,
        256 F.3d 1323 (Fed. Cir. 2001).....................................................................................6

Johnson Worldwide Associates, Inc. v. Zebco,
        175 F.3d 985 (Fed. Cir. 1999).....................................................................................19

Kearns v. Chrysler Corp.,
        32 F.3d 1541 (Fed. Cir. 1994).....................................................................................21

Kinik Co. v. ITC,
        362 F.3d 1359 (Fed. Cir. 2004).....................................................................................5

Markman v. Westview Instruments, Inc.,
        52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)......................23

McCarthy v. Lehigh Valley R.R. Co.,
        160 U.S. 110, 16 S. Ct. 240 (1895).............................................................................20

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 07 CV 0894 DMS (POR)

Modine Mfg. Co. v. U.S.I.T.C.,
    75 F.3d 1545 (Fed. Cir. 1996)..............................................................22

NTP, Inc. v. Research In Motion, Ltd.,
    418 F.3d 1282 (Fed. Cir. 2005).............................................................20

Oatey Co. v. IPS Corp.,
    2008 U.S. App. LEXIS 1926 (Fed. Cir. Jan. 30, 2008) ........................14

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)...........................5, 6, 14, 16

Prima Tek II, LLC v. Polypap S.A.R.L.,
    318 F.3d 1143 (Fed. Cir. 2003)...............................................................6

Renishaw PLC v. Marposs Societa' Per Azioni,
    158 F.3d 1243 (Fed. Cir. 1998).........................................................5, 21

Resonate, Inc. v. Alteon Websystems, Inc.,
    338 F.3d 1360 (Fed. Cir. 2003).............................................................13

Rheox, Inc. v. Entact, Inc.,
    276 F.3d 1319 (Fed. Cir. 2002).............................................................14

Tandon Corp. v. U.S.I.T.C.,
    831 F.2d 1017 (Fed. Cir. 1987).............................................................13

United States v. Adams,
    383 U.S. 39, 86 S. Ct. 708 (1966)...........................................................5

Vitronics Corp. v. Conceptronic, Inc.,
    90 F.3d 1576 (Fed. Cir. 1996)...............................................................23

FEDERAL STATUTES

35 U.S.C. § 112, ¶ 4..................................................................13, 14

# I. INTRODUCTION

## A. CARL ZEISS VISION'S INVENTION AND ITS SIGNIFICANCE[1]

### 1. Technical Background

Spectacle lenses are prescribed by values for sphere, astigmatism and prism that the lens achieves at the distance and near reference points.[2] Thus, a doctor will prescribe the necessary sphere (to correct near- or farsightedness) and astigmatism correction (different power in different directions), if necessary. A particular individual may need one or both of these corrections.[3]

With age, patients lose their ability to accommodate (vary their focus). These patients need different power lenses depending on whether they are reading, looking at intermediate distances, or looking at far distances. Some individuals deal with this problem by having a separate pair of reading spectacles or bifocal spectacles.

A progressive or multifocal lens has different powers in different areas of the lens. Typically, a power for distance viewing is provided in the upper portion (distance zone) of the lens and a power for reading is provided in a lower portion (near zone) of the lens. The power of the lens changes gradually from the distance to the reading zone in an area called the "corridor." A simplified version of Figure 4a of the patent is shown below with labels indicating the various zones.

---

[1] The technical background and descriptions in this section will be the subject of the testimony of Gerhard Kelch. Mr. Kelch is a long-time lens designer at Carl Zeiss Vision and today is the Product Manager of Research and Development. His duties today include lens design and software development.

[2] *See* Khachatourian Decl., Khachatourian Decl., Exhibit A, the patent-in-suit, U.S. Patent No. 6,089,713 ("the '713 patent"), at column 1, lines 38-40. These terms are defined and discussed in Section C below.

[3] Sometimes a directional correction called "prism" is also specified.

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 07 CV 0894 DMS (POR)



The areas shown in the drawing are not visible to the observer, unlike the "lined" external appearance of bifocals. The wearer of the progressive casts his gaze through the appropriate zone, for example, to read or to look at a distant object.

The amount of power change in a progressive lens is part of the wearer's prescription (usually called "add" power). The figure below is a contour plot showing how the power of the progressive lens changes. The add power is zero in the distance zone surrounding the distance measurement point. The add increases to two diopters in the reading or near zone (darkest area).



**Mean Add Power Plot**

A prescription for such a lens typically would include the add power and also the sphere power, astigmatism correction, and prism at a distance measurement point in the distance viewing portion of the lens.

> 2. **Prior to Carl Zeiss Vision's Invention, Progressive Lenses Were Poorly Customized And Required Large Inventories Of Expensive Semi-Finished Lens Blanks**
>
> a. **Conventional Progressive Lenses**

Prior to the late 1990s, commercial progressive lenses were made from non-customized

1  semi-finished blanks. These blanks had various generic progressive surfaces (add powers) molded

2  on their front surfaces. The back surface was unfinished. An inventory of hundreds of such blanks

3  was required to fill common prescriptions. Such conventional lenses are described in an article

4  written by Signet's lens designer, Hugh McLoughlin,[4] in which the following figure appears:



11  Conventionally, to produce a lens for an individual, a generic blank of the prescribed add

12 power had to be finished to cope with the specific power needs and astigmatism of the wearer's eye.

13 This was achieved by aligning and blocking the blank in a cutting machine, and then forming a

14 relatively simple, generally symmetric surface (constant curve) on the backside (eye-side) of the

15 lens. Such lenses were not individually optimized for the wearer, but instead relied on

16 approximations provided by the selected generic blank. Such lenses used both lens surfaces

17 partially to fill the prescription: the progressive power (zones of differing power) was molded on

18 the front; the particular prescribed power and correction for the wearer's astigmatism were

19 machined into the back side.

### b.  The Carl Zeiss Vision Invention And Patent

21  In 1996, Carl Zeiss Vision inventors Hof and Hanssen made the invention to which the

22 patent-in-suit is directed. Defying decades of commercial convention which dictated large

23 inventories of expensive generic progressive blanks and the separation of portions of the

24 prescription on opposite sides of the lenses, Hof and Hanssen taught individual matching or

25 optimizing the designs for each wearer and then combining all the prescription elements of a very

---

[4]  Khachatourian Decl., Exhibit C, McLoughlin, H., "Progressive Freeform Lens Design - A Watershed in the History of Spectacle Lenses," MAFO (May 2007).

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 07 CV 0894 DMS (POR)

complex design on the backside of a few, simple blanks with simple spherical front surfaces. The blanks were readily available, inexpensive and easy to make -- a spherical surface is perhaps the easiest of all surfaces to prepare. The blanks were also easy to align in the machinery which formed the complex, highly asymmetric backside surface, which came to be known as a progressive "free form" surface.

The Carl Zeiss Vision invention includes a <u>process</u> invention which produces spectacle lenses for wearers. The significance of the process aspect of the invention is this: a basic starting design of a progressive lens is developed "with the aid of a highly skilled optics designer"[5] and that design becomes a starting point for the individual matching or optimizing which produces final products for the wearers. When a prescription is given for an individual, a starting back surface design is modified to produce an individualized or customized design for that individual. As stated in the patent-in-suit, the invention provides ". . . a spectacle lens that can be quickly produced, according to the individual requirements of the wearer, from a very easily produced lens blank . . ." *See* Declaration of Karineh Khachatourian in Support of Carl Zeiss Vision's Opening Claim Construction Brief ("Khachatourian Decl."), Exhibit A, at col. 2, lns. 46-49. An advantage of the invention is that a standard clamping tool can be used to hold blanks that have the simple spherical front surface. *Id.* at col. 6, lns. 4-9. The complex, prescription progressive free form surface is then formed on the back surface. Such an arrangement is shown in Figure 2b of the patent [additional labels added]:

---

[5] [O]ptimizing a [freeform] surface for given requirements is a lengthy process with manual interaction of a highly skilled optics designer." *See* Khachatourian Decl., Exhibit B, the file history of the '713 patent at Tab 2, the Amendment of July 8, 1999 at p. 3.

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 07 CV 0894 DMS (POR)

FIG. 2b

Signet's lens designer has called this type of design "a watershed in the history of spectacle lenses."[6]

## B. GENERAL PRINCIPLES OF CLAIM INTERPRETATION APPLICABLE TO THE PRESENT CASE

The Federal Circuit has provided the following guidance in the interpretation of claims which is especially relevant in the present case.

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claims.

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted). Claim construction is to be performed with a view to ascertaining the invention. *United States v. Adams*, 383 U.S. 39, 48-49, 86 S. Ct. 708, 713 (1966). In the present case, the claimed invention must be interpreted against the backdrop of the conventional, non-individualized, molded front surface progressive lenses which were the industry standard when the invention was made.

"The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history." *Kinik Co. v. ITC*, 362 F.3d 1359, 1365 (Fed. Cir. 2004). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)

---

[6] McLoughlin, H., "Progressive Freeform Lens Design - A Watershed in the History of Spectacle Lenses," MAFO (May 2007) (Khachatourian Decl., Exhibit C) [emphasis added].

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF        CASE NO. 07 CV 0894 DMS (POR)

1  (en banc).  Patents, like the Hof patent, usually describe specific embodiments or methods as

2  examples or embodiments.  Claims are often presented which are broader than any one example.

3  An invention may be fairly claimed more broadly than a preferred embodiment or example.  *See,*

4  *e.g., Prima Tek II, LLC v. Polypap S.A.R.L.*, 318 F.3d 1143, 1151-52 (Fed. Cir. 2003).  Where it is

5  unclear whether an isolated passage of a patent refers to an example or general statement, the

6  passage should not be engrafted as a limitation onto the claim.  *See Interactive Gift Express, Inc. v.*

7  *Compuserve, Inc.*, 256 F.3d 1323, 1334-35 (Fed. Cir. 2001).  The patent description may run from

8  the general to the specific; but ultimately, the words of claims are the measure of the invention.  *See*

9  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a 'bedrock principle'

10 of patent law that 'the claims of a patent define the invention to which the patentee is entitled the

11 right to exclude.'"  [Citation omitted.]).

12 **II.  BASIC CLAIM TERMINOLOGY (AS TO WHICH THERE IS AGREEMENT OR**
13 **LITTLE DISPUTE)**

14     **A.    Spectacle Lens (Agreed)**

15        A "spectacle lens" is a lens used to correct vision by refracting incoming light, which is

16 mounted in a frame and held in front of the wearer's eye.

17     **B.    Spherical . . . Front Surface (Agreed)**

18        The "front surface" is the surface of the lens facing away from the wearer's eye.  The plain

19 meaning of "spherical" is sphere-like in the sense of being shaped like a portion of the surface of a

20 sphere.[7]

21     **C.    Back Surface (Agreed)**

22        The "back surface" is the surface of the lens facing toward the wearer's eye.  The

23 arrangement of features thus far discussed is illustrated in Figure 3 of the Hof patent.

24 _____

25 [7]   The claims also use the term "rotationally symmetric aspheric front surface" as an alternative to "spherical."  This
   alternative is irrelevant to the case given that Signet has admitted that its front surface is spherical (Response to Request for
26 Admission No. 1) and no prior art has been identified with the aforementioned aspheric shape.  However, for completeness,
   the parties have agreed that, a "rotationally symmetric aspheric front surface is created by rotating a non-circular geometric
27 shape about a point or an axis, such as a parabola or an ellipse."

28

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF        CASE NO. 07 CV 0894 DMS (POR)



Here, 1 is the "spectacle lens;" 2 is the "spherical front surface;" 3 is the "back surface;" and 6 is the eye. See col. 7, ln. 22 - col. 8, ln. 7.

### D.   Individual Requirements of a Prescription for Spectacles

A spectacle "prescription" "may include a spherical component, a cylindrical [astigmatic] component, a prismatic component, an addition for near vision and the interpupillary distance." The quoted definition is from a dictionary definition offered by Signet in its preliminary claim construction.[8] These component terms are separately used in the claims and are defined below. An example of a prescription for a progressive lens is given below in section 11.

### E.   Diopter

A "diopter" is a unit specifying the power of a spectacle lens. It is the reciprocal of the focal length in meters.[9] The diopter is after abbreviated "D."

### F.   Spherical Power

Spherical power is simply the power of the lens prescribed to correct near-sightedness or far-sightedness. *See* the expected testimony of Gerhard Kelch in Support of Carl Zeiss Vision's Opening Claim Construction Brief ("Testimony of G. Kelch").

---

[8]   Khachatourian Decl., Exhibit D, <u>Dictionary of Optometry and Visual Science</u>, 5th ed. (2000) at 244-45 [parenthetical added].

[9]   Prism is measured in different units: "prism diopters," abbreviated "ΔD."

### G. Astigmatic Power

Many eyes suffer from the defect of astigmatism. The astigmatic eye needs a correcting lens whose power varies in different meridians. Such a correction is sometimes called a "cylinder" correction or requirement. Simply put, the eye needs a different corrective power in different directions.

A prescription for an astigmatic patient will include a "cyl" power and a direction in degrees. Testimony of G. Kelch. In the prior art, astigmatism correction was provided by a lens with cylinder -- a toric back surface. *Id.* Such a lens is shown here:



**A Lens With Cylinder Utilizes a Toric Surface**

### H. Distance of a Wearer's Pupils From Each Other

The term takes its plain meaning. The "distance" is specified in the art as "PD" or pupillary distance. *Id.* It is typically specified in millimeters in the prescription. *Id.* Pupillary distance is typically specified as the distance between the pupils or as the distance between each pupil and the face centerline. *Id.* PD is shown on the next figure below. Signet uses the abbreviation in its product descriptions. For example, Signet has said that PD is "critical to the correct customization and therefore optimization of the design to the frame size and shape."[10]

---

[10] Khachatourian Decl., Exhibit E, Signet's promotional internet posting for the accused product and process entitled: "Signet Armorlite Announces Kodak Unique Progressive Customization Meets Precision," 1/10/2007.

**Total Pupil Distance PD**

Center
Line

## I. Prismatic Correction

Sometimes a direction correction called "prism" is specified for a spectacle lens. Testimony of G. Kelch. An example of a prism correction, used to align binocular vision is shown below. Prism is also used to compensate for lens tilting of the spectacle frames. *Id*. The following figure illustrates prismatic correction:



## J. Multifocal (Agreed)

"Multifocal" means having more than a single corrective power. Progressive lenses are multifocal lenses which provide different power in their distance and near zones and a gradual

change in power there between as shown in the first figure above. The progressive requirement is typically specified as "add" power, as discussed in connection with the "mean add power plot" figure at page 2 above. *Id*.

### K. Without Point Symmetry and/or Axial Symmetry (Agreed)

The limitation "without point symmetry and/or axial symmetry" is given its plain meaning to one skilled in the art in the context of the Hof patent disclosure, and is interpreted as follows:

> The back surface is asymmetrical, e.g., there is no point or line about which symmetry is found. This type of asymmetric surface is referenced to in the art as "free form."

## III. EXAMPLE OF A PRESCRIPTION FOR A PROGRESSIVE LENS

As noted above, the claims use the term "individual requirements of a prescription for spectacles." In a progressive lens, such a prescription may include a spherical component, a cylindrical [astigmatic] component, a prismatic component, an addition for near vision and the interpupillary distance. The following is an example of a prescription for a progressive spectacle lens:

| SPH | CYL | AXIS | ADD | PD |
|-----|-----|------|-----|-----|
| -4.00 | 2.50 | 45 | 2.00 | 33 |

The prescription would be interpreted as follows:

SPH -4.00 = -4.00 diopters of power at the distance measurement point.
CYL 2.50 = 2.50 diopters of cylinder (astigmatism) correction at the distance measurement point.
AXIS 45 = 45 degrees - the direction of the axis of the cylindrical correction.
ADD 2.00 = 2.00 diopters - the increase in power from the distance zone to the near zone.
PD 33 = 33 millimeters - The distance between the pupil and the center of the face.

*Id*. Prism might also be specified.

## IV. THE ASSERTED CLAIMS

The asserted claims are set out below, with the disputed terminology underlined:[11]

---

[11] Asserted claim 8 has been omitted here. Its terminology is essentially the same as asserted claim 1, with the exception discussed below.

1           1.  A spectacle lens, comprising:

2           a spherical or rotationally symmetrical aspheric front surface, and

3           a back surface that serves as a prescription surface and is individually optimized in order to fulfill all individual requirements of a prescription for spectacles excluding 0 diopters, including spherical, astigmatic or prismatic power and distribution of said requirements over said prescription surface, said back surface comprising a multifocal surface without point symmetry or axial symmetry.

5.  A spectacle lens according to claim 1, wherein an individual distance of a wearer's pupils from each other is taken into account in an optimization calculation.

6.  A process for producing spectacle lenses with multifocal power, comprising:

employing semi-finished lenses having spherical or rotationally symmetrical aspheric front surface with a few different radii, and

matching all individually required dioptric power, excluding 0 diopters, at a back surface of said spectacle lens said back surface comprising a multifocal surface without point symmetry and/or axial symmetry.

7.  The process for producing spectacle lenses according to claim 6, further comprising carrying out at least one individual optimization for a wearer of the spectacle lens on said back surface so that sphere, astigmatism, and prism dioptric prescription values are established at all points on said back surface facing a wearer's eye.

## V.    INTERPRETATION OF TERMS IN DISPUTE

### A.    Interpretation of Claim 6 Limitation:  "Matching All Individually Required Dioptric Power"

#### 1.    Matching Includes a Variety of Processes

The limitation of claim 6, "matching all individually required dioptric power" should be interpreted as follows:

/ / /

/ / /

/ / /

- 11 -

| | |
|---|---|
| 1 | The recited matching refers to adjusting of a starting design to the individual spectacle prescription.[12] As discussed below, matching |
| 2 | can be attained, for example, by adding spherical and cylindrical surface designs to the starting progressive surface design. |
| 3 | Alternatively or in addition, matching can be attained by individual optimization.[13] |
| 4 | |

5    Testimony of G. Kelch. Matching is discussed at various places in the specification of the patent-

6    in-suit. For example, Khachatourian Decl., Exhibit A at col. 2, lns. 61-65, it is stated:

| | |
|---|---|
| 7 | Spectacle lenses with multifocal power are produced from semi-finished lenses with a spherical . . . front surface with a few different |
| 8 | radii such that the whole <u>individual matching</u> of required dioptric power takes place on the back surface of the spectacle lens. |
| 9 | [Emphasis added.] |

10    The matching employs "previously carried out design considerations." *Id.* at col. 3, lns. 64-65.

11    Testimony of G. Kelch. The individual matching to lens(es) "from previously carried out design

12    considerations" can be used "as a beginning for optimization." Khachatourian Decl., Exhibit A at

13    col. 3, ln. 65 - col. 4, ln. 5. *Id.*

14    A matching is also produced by the "first embodiment" of the invention:

| | |
|---|---|
| 15 | In a first embodiment of the invention, the dioptric power of a multifocal surface . . . and of a spherical and toric back surface, which |
| 16 | are at present divided between the front and back sides of a spectacle lens, are <u>added</u> and are applied to the back side, taking account of the |
| 17 | power of the spherical front side. |

18    *Id.* at col. 4, lns. 36-41. [Emphasis added.] The "adding" approach can yield "a draft design [for

19    optimization] for a case of use situated in the neighborhood in the parameter region." *Id.* at col. 4,

20    lns. 61-64. In a progressive lens, the adding approach inherently results in an essentially exact

21    <u>match</u> to the prescription at the distance and near measurement points. Testimony of G. Kelch. As

22    noted above, it can be used as a "beginning" or "draft design" for individual optimization. *Id.*

23

24 _____

25    [12]   According to Signet's dictionary definition, a "spectacle prescription may include a spherical component, a cylindrical

26    component, a prismatic component, an addition for near vision and the interpupillary distance." Khachatourian Decl., Exhibit D, <u>Dictionary of Optometry and Visual Science</u>, 5th ed. (2000) at 244-45.

27    [13]   The interpretation of "individual optimization" is separately discussed below.

28

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF      CASE NO. 07 CV 0894 DMS (POR)

## 2. The "Matching" of Claim 6 is Broader Than and Inclusive of the "Individual Optimization" Processes

Signet has attempted to equate claim 6 "matching" with the "individual optimization" recited in other claims. This result is simply incorrect and at odds with accepted principles of claim interpretation.

Individual optimization is merely one way of employing or achieving the matching of claim 6. This fact is made clear by the claims themselves and the specification of the Hof patent.

### a. The Claims Use Different Words

Claim 6 uses the term "matching all individually required dioptric power." Claim 1 uses different terms: "individually optimized." "In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claim connotes different meanings." *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *Tandon Corp. v. I.T.C.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). "[P]atentees are not required to claim each part of an invention with the same amount of detail . . . ." *Resonate, Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1365 (Fed. Cir. 2003). If Zeiss had wished to claim individualization with the same breadth in both claims 1 and 6, presumably Zeiss would have used the same terms. This it did not do.

### b. Claim 7 Treats the Individual Optimization Process as a Subset of Claim 6 Matching

The relationship between "matching" and "optimization" is also dictated by the "doctrine of claim differentiation." Claim 7 of the Hof patent is a dependent claim -- it depends from claim 6. Under 35 U.S.C. § 112, ¶ 4:

> . . . a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."

From this it follows that dependent claim 7, which recites "individual optimization," must be narrower than claim 6 "matching."

The "doctrine of claim differentiation" militates against interpretation of broader

- 13 -

1   (independent) claims of a patent so as to import into such claims the limitations of narrower claims.

2   *D.M.I. Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985). The doctrine can arise from the

3   presumption that a dependent claim should, consistent with 35 U.S.C. § 112, ¶ 4, be narrower than

4   the independent claim from which it depends. "[T]he presence of a dependent claim that adds a

5   particular limitation gives rise to a presumption that the limitation in question is not present in the

6   independent claim." *Phillips*, 415 F.3d at 1314-15. Accordingly, the recited individual

7   optimization of claim 7 is properly interpreted to be narrower than the matching of claim 6. In other

8   words, the process of claim 7 with its individual optimization is a subset of claim 6's matching

9   processes. This interpretation is born out by the Hof specification.

10            **c.    The Patent Specification Discloses Different Ways of Achieving**
                     **Matching**

11            Col. 4, lns. 3-5 (Khachatourian Decl., Exhibit A) indicates that one of the ways that a

12  matching can be achieved is in the process of optimization. Optimization can "lead to a matching of

13  the starting surface to the individual prescription, wherein the similarity of the resulting surface to

14  the design family is insured . . ." *Id*. at col. 5, lns. 9-12. [Emphasis added.]

15            The '713 patent clearly discloses a "first" and a "second" embodiment. The "first

16  embodiment" involves adding the multifocal surface and the spherical or toric prescription portion

17  and applying it to the back surface. *Id*. at col. 4, lns. 36-41. This results in a matching of all

18  individually required dioptric power at the distance and near measurement points. Testimony of G.

19  Kelch. The "second embodiment" calls for carrying out an "individual optimization." *Id*. at col. 4,

20  lns. 42-66. If claim 1's "individually optimized" were to be equated with claim 6's "matching all

21  individually required dioptric power," then all the claims would cover only the second embodiment.

22  The surrender of one of the two preferred embodiments, would have to find "highly persuasive

23  evidentiary support" in the prosecution history. *See Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327

24  (Fed. Cir. 2002). As recently stated by the Federal Circuit, "[w]e normally do not interpret claim

25  terms in a way that excludes embodiments disclosed in the specification." *Oatey Co. v. IPS Corp.*,

26  2008 U.S. App. LEXIS 1926 at *9 (Fed. Cir. Jan. 30, 2008) ("[W]here claims can reasonably be

27  interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that

28  embodiment, absent probative evidence on the contrary.").

1    The "matching" language was in the originally filed claim 6 and not amended or added

2    during prosecution. Likewise, originally filed dependent claim 7 contained the limitation

3    "individual optimization."[14] Thus, from the outset, Zeiss claimed the invention broadly in claim 6

4    which embraced both the first and second embodiments and pursued dependent claim 7 to narrow

5    coverage to processes involving individual optimization.

6            **3.     Matching is a Way of Attaining Special Optimization**

7         The Hof specification states at col. 5, ln. 66 through col. 6, ln. 3:

8             <u>Matching</u> to the individual prescription value <u>can be</u> attained by a
     <u>special optimization</u> of the free-form surface (back surface of the
9             spectacle lens). [Emphasis supplied.]

10   In col. 5, lns. 21-35, special optimization is discussed and nine examples are given of requirements

11   for special optimization including:

12            "individual dioptric values at the far and near points
              (left/right)," and "pupillary distance."
13   Thus, special optimization is treated as an example of a way of achieving matching. To do as claim

14   6 states -- matching all individually required dioptric power -- will require achieving the prescribed

15   dioptric power at the far and near measurement points, but does not necessarily require optimization

16   nor the achieving of other requirements listed in col. 5. Testimony of G. Kelch. The first

17   embodiment addition of surfaces can provide the individual dioptric values at the far and near points

18   without optimization. *Id.*

19          **B.    Interpretation of the Claim 1, 7 and 8 Limitations "Individually Optimized" or**
                 **"Individual Optimization"**

20

21        Zeiss has advanced the following claim construction:

22            "Optimized" has a plain meaning to one of skill in the art.
              "Optimization" is a mathematical calculation[15] which begins with a
23            starting design[16] and modifies the starting design[17] to better satisfy
              target functions or target data.[18]

24   _____

25   [14] Khachatourian Decl., Exhibit B at Tab 1, the Hof application as filed in the U.S.P.T.O. on January 16, 1998 at pp. 17-18.

26   [15] Khachatourian Decl., Exhibit A at col. 4, ln. 55 ("[i]n the calculated solution . . .").

27   [16] See, e.g., Khachatourian Decl., Exhibit A at Abstract ("The shape of this back surface follows for an individual
     optimization calculation using the design of the predefined starting surface as the start of the optimization."); col. 4, lns. 3-5
28

- 15 -

> "Individually optimized" means the back surface is custom designed
> using a calculation which employs the prescription requirements of
> the individual, the spherically shaped side, and a starting design,[19] and
> which produces an optimized design fulfilling the individual's
> prescription requirements on the lens back surface.[20]

"In some cases, the ordinary meaning of claim language as understood by a person of skills in the art may be readily apparent even to lay judges . . . ." *Phillips*, 415 F.3d at 1314. "Optimization" is such a word. It carries with it the notion of a starting point and proceeding to a better point. Testimony of G. Kelch. The word is nuanced in the field of lens design, by the understanding that lens design always involves goals and trade-offs which must be addressed to proceed toward a better design. *Id.* The particular goals and starting points used are details of a particular implementation of the invention. *Id.* These particular goals and starting points are part of the art of the designer, not claim limitations. *Id.*

"When a claim term has an accepted scientific meaning, that meaning is generally not subject to restriction to the specific examples in the specification." *Glaxo Wellcome, Inc. v. Andrx Pharmaceuticals, Inc.*, 344 F.3d 1226, 1233 (Fed. Cir. 2003). The specification and prosecution history makes clear that "individually optimized" progressive surface was used to distinguish the situation in the prior art where a blank with a non-individualized progressive surface was designed

---

("the shape of this surface results from an optimization calculation with the use of the design results as a beginning for optimization."); col. 4, lns. 6-7 ("starting from a previously determined starting surface."); and col. 4, lns. 61-62 ("The usual starting values have to be provided for the solution of the optimization task.").

[17] Khachatourian Decl., Exhibit A at col. 4, lns. 63-64 ("a draft design for a case of use situated in the neighborhood in the parameter region . . .").

[18] Khachatourian Decl., Exhibit A at col. 4, lns. 53-54 ("An individual optimization of the prescription surface is carried out for the target data . . .").

[19] Khachatourian Decl., Exhibit A at claim 1 ("a spherical . . . front surface."). Claim 6 ("semifinished lenses having spherical . . . front surface with a few different radii."); col. 5, lns. 43-47 ("there is associated with the design a mathematically described rule for which prescription requirement, which of the coursely stepped standard front sides, which starting surface, and which evaluations, are to be used for the optimization.").

[20] Khachatourian Decl., Exhibit A at claim 1 ("in order to fulfill all individual requirements of a prescription for spectacles. . .").

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF        CASE NO. 07 CV 0894 DMS (POR)

1 and later finished by providing a simple (spherical or toroidal) prescription surface on the other

2 side. *See* Khachatourian Decl., Exhibit A at col. 1, lns. 22-35 and Khachatourian Decl., Exhibit B at

3 Tab 2, the Amendment of July 8, 1999 at p. 3, lns. 14-17.

1. <b>There Are Many Ways to Optimize</b>

5 There are many mathematical techniques known for performing optimization. Testimony of

6 G. Kelch. Various techniques are exemplified in the patent-in-suit, also in U.S. Patent No.

7 5,137,343 to Kelch et al. (Khachatourian Decl., Exhibit J) *Id.* The Shannon article[21] also provides

8 examples and general information on optical design optimization. Different lens properties can be

9 taken into account in optimization. Testimony of G. Kelch. For example, optical aberrations,

10 space, weight, material choice or other properties can provide the design goal or target.[22] Signet

11 indicated in the announcement of the accused product that it "optimize[s] visual performance for

12 frame size and shape."[23] Signet acknowledges that it uses "an iterative process to get from the

13 starting point of the design to the finished optimized article ready for production."[24] What the

14 various optimization processes have in common is a mathematical calculation that begins with a

15 starting design and modifies that starting design to better satisfy target functions or target data

16 (goals). Testimony of G. Kelch.

2. <b>Optimization Does Not Require a "Best" Lens Design or Use of<br>Particular Mathematical Functions, Criteria or "Weighting"</b>

19 Signet's "amended" claim interpretations attempt to define optimization in terms of

---

[21] Khachatourian Decl., Exhibit F, R. Shannon, "Design Optimization," <u>The Art and Science of Optical Design</u>, Chapter 4, pp. 334-353 (Cambridge University Press 1997).

[22] *Id.* at pp. 335.

[23] Khachatourian Decl., Exhibit E, "Signet Armorlite Announces Kodak Unique Progressive Customization Meets Precision," 1/10/2007 [emphasis added]. Usage of terms by an accused infringer can support a claim interpretation. *See Ajinomoto Co., Inc. v. Archer-Daniels Midland Co.*, 228 F.3d 1338 (Fed. Cir. 2000).

[24] Khachatourian Decl., Exhibit C, the McLoughlin article at p. 30 [emphasis added].

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 07 CV 0894 DMS (POR)

1  particular mathematic functions, target functions and weighting functions.[25]  Signet also contends

2  that optimization necessarily entails "specific target criteria for a number of points over the surface

3  of the lens," that the design uses "the best fit solution to modify the predefined starting surface" and

4  that the lens "best satisfies all correcting power values specified for the wearer."  This interpretation

5  is improperly limiting and inconsistent with the way the word "optimization" would be understood

6  by one skilled in the art in the context of the patent.  Testimony of G. Kelch.

### a.      Optimization Does Not Require a "Best" Lens Design

8          The word "best" or "best fit" appears only once in the '713 specification.

>An individual optimization of the prescription surface is carried out
>for the target data, so that the target data are attained <u>in the sense of a</u>
>      <u>best fit</u>.

                                            * * *

>The usual starting values have to be provided for the solution of the
>optimization task.  This is to take place in that a draft design for a
>case of use situated in the neighborhood in the parameter region is
>provided at different support points that do not lie too close together .
>. . .  (Col. 4, lns. 53-65.)  [Emphasis added.]

16  This simply means making a mathematic calculation that strives to modify the starting design to

17  better achieve the target or goals.  Testimony of G. Kelch.  It would not be understood to require an

18  objectively best lens or that the calculation would run to a conclusion which was best by any or all

19  target criteria.  *Id.*  As indicated in claim 1, the distribution of the individual requirements over the

20  back surface is fulfilled by forming the back surface in accordance with the individually optimized

21  design.  This can result in design compromises such as suggested by Figure 4a and 4b of the patent-

22  in-suit.  *Id.*

### b.      Optimization Does Not Require Weighting or Weighting Functions

25          The words "weighting" or "weights" appear four times in the '713 specification and nowhere

---

[25]  Note, in its initial and responsive claim interpretation, Signet did not require "weighting functions" in its definition of
optimization.  It was only a belated afterthought to include such things in its elaborate "amended" claim interpretation.

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 07 CV 0894 DMS (POR)

in the claims:

      (1)     At Col. 3, ln. 39, it describes an "advantageous" way of optimizing "wherein the target functions for sphere, astigmatism and prism, or functions derived for these and their <u>weighting</u>, are chosen depending upon the results obtained in designing the predefined starting surfaces." [Emphasis added.]

      (2)     At col. 4, ln. 13, an "advantageous" embodiment (way of optimizing) is described in which similarity to the starting surface can be ensured by use of, among other things, a "continuous <u>weighting</u> function." [Emphasis added.]

      (3)     Col. 5, lns. 6-13 refers to a preferred embodiment where <u>weights</u> are used to achieve a starting design and where it is "possible" to use "<u>weighting</u> functions," among other things, to "insure" similarity to the starting design. [Emphasis added.]

This description of a preferred embodiment falls far short of defining optimization as requiring weighting or weighting functions.

     The common sense meaning of "optimization" needs to include some criteria as to which a draft lens design can be judged to be better than a starting design. However, requiring "weighting" improperly limits the definition of optimization. Further, it is an improper attempt to insert details of preferred embodiments into a claim which is clearly drafted in broader terms.

     Even with the disclosure in the specification of embodiments of optimization involving weighting, the claim term is not necessarily limited to that embodiment. *Accord, Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." [Internal quotations and citations omitted.]) Weighting functions are not used consistently in the "optimizations" examples described in the patent specification and certainly are not presented as a defining element of optimization.

     "Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition." *Johnson Worldwide Associates, Inc. v. Zebco*, 175

F.3d 985, 991 (Fed. Cir. 1999). "[I]f we once begin to include elements not mentioned in the claim in order to limit such claim . . . we should never know where to stop." *McCarthy v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116, 16 S. Ct. 240 (1895) as quoted in *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310 (Fed. Cir. 2005). Accordingly, the Court should not redraft the patent claims to require weighting or weighting functions, where Zeiss clearly elected not to so limit its claims.

### C. Interpretation of the Claim 6 Limitation: "Semi-finished lenses having spherical . . . front surface with a few different radii"

The limitation of claim 6, "semi-finished lenses having spherical . . . front surface" should be given its plain meaning to one skilled in the art in the context of the Hof patent disclosure.

As a preliminary matter, Zeiss has accepted Signet's dictionary definition of "semifinished lenses" to mean:

> Lens blanks in which one face is a finished surface and the other face is unfinished.[26]

The real disagreement concerns the meaning of a "few" radii.

It is Zeiss' position that a "few" is understood in comparison to the 100's of different (expensive) conventional front progressive surface blanks used in the prior art. About ten is given in the specification as an example of a "few."

As stated at col. 6, lns. 33-34, ". . . only a <u>limited number</u> of front surface radii, e.g. 10, is required. . . ." [Emphasis added.] The prosecution history states: "[t]he lens can be taken from a stock of only a very few different types." Khachatourian Decl., Exhibit B at Tab 2, the Amendment of July 8, 1999 at p. 3. This approach is compared to the conventional prior art approach:

> [U]p to now, all manufacturers kept a stock of pre-fabricated blanks with one [non-rotationally symmetric (progressive)] side and shape the other side torically or almost torically according to the wearer's prescription. A large number of different blanks have to be kept in stock under the current approach.

*Id.* As an example, the inventory of front surface progressive blanks made from a particular kind of plastic would require 336 different blanks.[27]

---

[26] Khachatourian Decl., Exhibit I, <u>Dictionary of Ophthalmic Optics</u> (1995) at 40.

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF      CASE NO. 07 CV 0894 DMS (POR)

The term "few" must be evaluated in context, not limited to a numeric example. "Few" obviously does not equate to 10 in mathematics or linguistics. A "few" is a small number or "limited" number. If the applicant wanted to claim "about 10" that is what the claim would have said. Accordingly, "few" would be understood as a "limited" number of semi-finished lenses, in comparison to the "large" number of semi-finished lenses employed in the prior art. Testimony of G. Kelch.

This result is in accordance with the law regarding interpretation of such terms. The problem the inventor was attempting to solve is a relevant consideration. *Applied Materials, Inc. v. Advanced Semiconductive Materials Am.*, 98 F.3d 1563, 1573 (Fed. Cir. 1996). In interpreting words of degree, descriptive terms should be interpreted with a view to the inventor's purpose. *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 450 (Fed. Cir. 1986) (concluding that claim "smooth" does not mean absolutely ridge-free). "[W]hen a claim term is expressed in general descriptive words, we will not ordinarily limit the term to a numerical range that may appear in the written description. . . ." *Renishaw PLC v. Marposs Societa Per Agioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). Consistent with these principles of claim interpretation, the term "a few" should be interpreted as a limited number in comparison with the hundreds of conventional semi-finished front progressive blanks used in the prior art.

## D. The Lack of Symmetry Limitations of Claim 1, 6 and 8 are Equivalent

The Hof patent notes that the availability of expanded production technological possibilities to produce "strongly asymmetrical"[28] surfaces by "direct processing." Khachatourian Decl., Exhibit

---

[27] The inventory would need to provide, typically seven base curvatures from -6D to +6D. A typical number of add powers would be 12, from .75 to 3.5D in .25D increments. Design variations, for example, to fit different frame designs might come in two varieties. Both left eye and right eye lens blanks must be provided. The total number of blanks can be calculated by multiplying all the variables: 7 (base curves) x 12 (add powers) x 2 (design types) x 2 (left or right) = 336. Testimony of G. Kelch.

[28] In contrast, the prior art Kelch '503 patent (Khachatourian Decl., Exhibit K) is said to employ a "free form surface with small deviations for the sphere/torus." Khachatourian Decl., Exhibit A at col. 1, lns. 50-53. The Kelch '503 (Khachatourian Decl., Exhibit K) patent also calls this surface "nonsymmetrical" in claim 1. "It is well-settled that reference may be had to prior art when it will assist a court in determining how a disputed claim is understood by those skilled in the art...." *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547 (Fed. Cir. 1994).

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF    CASE NO. 07 CV 0894 DMS (POR)

A at col. 1, lns. 54-58. The invention is said to be well practiced by such direct processing. *Id.* at col. 6, lns. 37-38. The back surface of the lens is described as a "free-form" surface in the Hof patent. *See id.* at Abstract, ln. 15; col. 5, lns. 18-19. "Matching to the individual prescription value can be attained by a special optimization of the free-form surface (back surface of the spectacle lens)." *Id.* at col. 6, lns. 1-3.[29]

A spherical surface is the relevant example of a surface with point symmetry. Testimony of G. Kelch. A toroidal surface, e.g., a cylindrical surface, is the relevant example of a surface with axial symmetry. *Id.* The claim limitation in question would be understood by one skilled in the art to exclude these simple surfaces.[30] *Id.* It is clear in the context of the Zeiss patent, that Zeiss was claiming lack of symmetry to distinguish over conventional progressive lenses in which the back surfaces were spherical or toroidal. *Id.*

Claims 1, 6 and 8 phrase the asymmetry limitations slightly differently. Claim 1 uses the phrase "without point symmetry or axial symmetry." Claim 6 says "without point symmetry and/or axial symmetry." Claim 8 says "without point symmetry and axial symmetry." The different phraseology is simply different ways to describe the asymmetry. In English, the statement, "I am without a right shoe or left shoe" means the same thing as the statement "I am without a right shoe and left shoe." It means that I have no shoes. In the relevant context of the claim, it means the back surface is something other than spherical (point symmetric) and also not cylindrical (axially symmetric). This is how it would be understood by one skilled in the art. Testimony of G. Kelch.[31]

---

[29] Signet has also used the term "freeform" to describe its backside progressive surface. See Khachatourian Decl., Exhibit C at p. 24 and Khachatourian Decl., Exhibit L, Signet's promotional internet posting for the accused product and process entitled: "KODAK Unique, new PAL from Signet Armorlite," 2/28/07.

[30] Signet's expert, Mo Jalie, defines a free form surface as one which defies simple mathematical description. Spheres and cylinders have simple mathematical descriptions. Khachatourian Decl., Exhibit G, Jalie, "Free-form Technology," Optician, Nov. 16, 2007.

[31] Mathematical precision should not be imposed on claim interpretation for its own sake; a patentee has the right to claim the invention in terms that could be understood by persons of skill in the field of the invention. *Modine Mfg. Co. v. U.S.I.T.C.*, 75 F.3d 1545 (Fed. Cir. 1996).

1    **E.     Interpretation of the Claim 1 and 8 Limitation:  "including spherical,
2           astigmatic or prismatic power . . ."**

3         A spectacle prescription may include a spherical component (to correct far sightedness or

4    near sightedness), a cylinder component (to correct astigmatism), or a prismatic power (to correct

5    line of sight).[32]  As to "astigmatism," many eyes suffer from the defect of astigmatism.  The

6    astigmatic eye needs a correcting lens whose power varies in different meridians.  Testimony of G.

7    Kelch.  Such a correction is sometimes called a "cylinder" correction or requirement.

8         This limitation was discussed explicitly in the prosecution history of the Hof patent:

9               The present invention utilizes only one surface to cope with all the
                individual requirements namely the progressive or multifocal
10              requirements as well as necessary cylindrical [astigmatic]
                requirements and possible prismatic values prescribed for the wearer
11              of the lens.[33]

12   It is, of course, appropriate to look at the prosecution history as an important source of meaning for

13   the claim language.[34]  The claim limitation and prosecution history recognize that prescriptions

14   vary from individual to individual and that many individuals do not require one or more of the

15   recited corrections.  Testimony of G. Kelch.  The claim clearly does not require that the claimed

16   lens must correct every possible vision error or fill every individual use requirement; it only

17   requires that the lens fill one non-zero dioptric requirement of the prescription at the distance

18   measurement point.  *Id.*  However, given the fact that the claimed invention is to a multifocal lens,

19   the multifocal requirement (usually called "add" power) will always be part of the prescription and

20   be non-zero.  *Id.*

21

22
_____

23   [32]  See Signet's proffered definition for "prescription" from Khachatourian Decl., Exhibit D, the Dictionary of Optometry
     and Visual Science, 5th ed. (2000) at 244-45.

24   [33]  Khachatourian Decl., Exhibit B, Tab 2, the Amendment of July 8, 1999 at pp. 2-3 [parenthetical added; emphasis in
25   original].

26   [34]  "The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the
     true meaning of language used in the patent claims . . ." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir.
     1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  The record of proceedings before the PTO "is often of critical significance in
27   determining the meaning of the claims."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

28

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 07 CV 0894 DMS (POR)

**F.     Interpretation of the Claim 1, 6 and 8 Limitation:  ". . . excluding 0 diopters . . ."**

First, a "diopter" is a unit for specifying the power of a spectacle lens.[35]  Turning to claim 6, the "excluding 0 diopters" language is used in the following context:

> matching all individually required dioptric power, excluding 0 diopters.

Zeiss has stated, *inter alia*, in its proposed claim construction:

> The recited matching refers to adjusting of a starting design to the individual prescription.
>
>           \* \* \*
>
> Dioptric power is used to specify prescriptions for astigmatism and sphere . . .

Self-evidently, the term "excluding 0 diopters" excludes the situation where the prescribed dioptric power is zero.  Testimony of G. Kelch.  If this occurs at the distance measurement point, the lens is not covered by the claim.  *Id.*  In other words, in a zero diopter prescription, the starting design need not be adjusted and the lens design has not been individualized.  *Id.*

The term "excluding 0 diopter" means the same thing in claims 1 and 8:

> . . . fulfill all individual requirements of a prescription for spectacles excluding 0 diopters, including spherical, astigmatic or prismatic power and distribution of said requirements over said prescription surface . . .

A 0 diopter condition is one where there is no spherical, astigmatic or prismatic correction.  This is the situation where the progressive lens design does not need to be individually optimized.  *Id.*  In other words, there is no prescriptive requirement for sphere, astigmatism or prism.  This typically is the case where there is no spherical, cylinder or prism at the distance measure point.  *Id.*

The prosecution history of the Hof patent illuminates the meaning of the term "excluding 0 diopters."  The Hof claims were at one time rejected over two prior art patents (Shirayanagi and Kelch '343) which each showed a conventional progressive lens in which the progressive surface

---

[35]  Khachatourian Decl., Exhibit H, Jalie, *The Principles of Ophthalmic Lenses*, at p. 5.  It is the reciprocal of the focal length in meters.  *Id.*

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF      CASE NO. 07 CV 0894 DMS (POR)

was on one side with the "other surface being spherical or torical as prescribed by the wearer."[36]

Zeiss pointed this out to the examiner. The examiner responded that "[i]f the prescriptive requirement of the wearer is 0 diopters for spherical distance, both references would meet the claimed limitation, fulfill all individual requirements of a prescription."[37] The phrase "excluding zero diopters" was subsequently added to the claims.[38] The amendment was explained as follows:

> The Office Action states that Kelch et al and Shirayanagi would meet claim 1 if the prescription requirement of the wearer is 0 diopters for a spherical lens.
>
> Claim 1 and 6 [are] amended to exclude 0 diopters.[39]

Thus, the phrase was added to exclude the non-individualized use of the starting design, in the unusual case that the individual had a zero diopter prescription. Testimony of G. Kelch.

### G. Interpretation of the Claim 7 Limitation: ". . . prescription values are established at all points on said back surface . . ."

In the claim 7 phrase ". . . prescription values are established at all points on said back surface . . .," Zeiss construes the phrase as indicating that the back surface is:

> [O]ptimized at a finite number of points that lie close enough for the design to be correct also between the points.

This is a direct quotation from the patent, Khachatourian Decl., Exhibit A at col. 3, lns. 41-43.

Signet, in its alternative claim construction, presented the definition:

> at each point on the back surface, approximated as the limit where the distance between points on the back surface tends to zero.

Which is somewhat similar to Zeiss' initial construction. Inexplicably, Signet filed a further paper amending its interpretation to be:

---

[36] Khachatourian Decl., Exhibit B, Tab 2, the Amendment of July 8, 1999 at p. 2.

[37] Khachatourian Decl., Exhibit B, Tab 3, the Official Action of October 1, 1999 at p. 2.

[38] Khachatourian Decl., Exhibit B, Tab 4, the Amendment of February 8, 2000 at p. 3.

[39] *Id.* (parenthetical added).

1        at each point on the back surface, calculated using solutions of error
       integrals and methods of calculus of variation.

2

3 As discussed below, Signet essentially got it right the first time, and its amended interpretation is

4 unhelpful and unnecessarily limiting.

5       The instant claim 7 limitation differs from that contained in dependent claim 3:

6            Optimized . . . at all points of said back surface.

7       This distinction is spelled out in the Hof patent:

8            A spectacle lens is frequently optimized at a finite number of ***points***
           that lie close enough for the design to be correct also between the
9            ***points*** [i.e., establish a correct design at all points as in claim 7]. By
           optimization at a finite number of ***points***, the problem can be
10            linearized, and can be solved using least square errors, as an over-
           determined system of equations. It is <u>also</u> possible to carry out an
11            optimization at all ***points*** [i.e., as claimed in claim 3]. Khachatourian
12            Decl., Exhibit A at col. 3, lns. 41-47 [parentheticals and emphasis
           added.]
13

14 There is, thus, a clear distinction between the choice of language of claim 3 and claim 7. Claim 3

15 covers lenses where, effectively, optimization occurs "at all points" on the back surface. Claim 7

16 refers to a process where values of sphere, cylinder or prism are "<u>established</u>" at all points. Thus,

17 any given point on the back surface of the claimed lens, a value of sphere, cylinder or prism will be

18 measurable which is related to the individual's prescription values. Testimony of G. Kelch. The

19 distinction is also borne out at Khachatourian Decl., Exhibit A, col. 3, lns. 50-53, where it is stated:

20            An optimization at a finite number of points that lie close together is
           simpler than an optimization at all points [claim 3] of the surface, and
21            <u>provides comparable results</u>. [Emphasis and parenthetical added.]

22       As stated in the Hof patent at *id.*, col. 1, lns. 38-43 [emphasis added]:

23            Spectacle lenses are described, in present terminology, by those
           values for sphere, astigmatism and prism that the lens achieves at the
24            far and near reference points. Values that deviate from these can be
           <u>established</u> at all other points of the spectacle lens, so that the dioptric
25            power can be described by functions in x and y coordinates.

26 The optimization process performed at selected, close lying points establishes dioptric values at all

27 other points. This is what claim 7 means when it says values are established. Testimony of G.

28 Kelch.

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF       CASE NO. 07 CV 0894 DMS (POR)

# VI. CONCLUSION

The claim terms should be interpreted in the context of what the inventors actually invented as it would be understood by one skilled in lens design. Such a designer would understand that the particulars of matching or optimization are left, as they always have been, to the discretion and needs of the designer, and not limited to the particular goals, preferred embodiments, or examples discussed in the patent specification. The appropriate focus is on the claiming of individual matching or optimizing the design for each wearer and then combining all the prescription elements in the complex design formed on the back side of a few simple lens blanks with simple spherical front surfaces. This is the progressive freeform approach which Signet's lens designer has called "a watershed in the history of spectacle lenses."

DATED: March 7, 2008        Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY LLP

ERIC WEISBLATT

Attorneys for Plaintiffs and Counter-Defendants,
CARL ZEISS INTERNATIONAL GMBH; and
CARL ZEISS VISION, INC.;

#1036946-v1

CARL ZEISS VISION'S OPENING CLAIM CONSTRUCTION BRIEF      CASE NO. 07 CV 0894 DMS (POR)