UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| CARL ZEISS VISION INTERNATIONAL GMBH; CARL ZEISS VISION INC, | Civil No.    07-cv-0894-DMS (POR) |
|---|---|
| Plaintiffs, | **REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTIONS FOR SANCTIONS BE GRANTED, IN PART, AND DENIED, IN PART** |
| v. | |
| SIGNET ARMORLITE INC, | |
| Defendant. | **[Docs. 351, 374, 376, 379]** |

Defendant Signet Armorlite, Inc. ("Signet") has filed a series of sanctions motions, all of which seek relief that would have a dispositive effect on the case. [Docs. 351, 374, 376, 379.]  In accordance with Local Rule 72.1(c), the Court addresses each motion on the basis of a Report and Recommendation.

## I.  SANCTIONS MOTION – FINANCIAL DOCUMENTS [DOC. 351]

On September 30, 2009, Defendant Signet filed under seal a Motion for Sanctions against Zeiss [Doc. 351].  On October 8, 2009, Signet moved to supplement its briefing of the sanctions motion.  [Doc. 359.]  The Court granted the Motion to Supplement and gave Plaintiffs Carl Zeiss Vision International GmbH and Carl Zeiss Vision Inc. ("Zeiss") leave to file an Opposition to the supplemental brief.  [Doc. 363.]  At present, the Motion for Sanctions is fully briefed and ripe for adjudication.

In its motion, Signet alleges that Zeiss violated Court orders by withholding financial documents relevant to damages and filed false declarations asserting compliance with the Court's

discovery orders.  Based thereon, Signet requests at least one of the following sanctions:

     (1)    dismissal of Zeiss's Complaint with prejudice;

     (2)    order striking Zeiss's damages claims;

     (3)    order precluding Zeiss from introducing any evidence of damages at trial; and

     (4)    award of attorneys' fees and expenses.

## A.     RELEVANT PROCEDURAL BACKGROUND

On October 5, 2007, Signet served its first set of Requests for Production, which included a request for documents upon which Zeiss based its claims for damages.  Specifically, Signet requested financial statements and documents related to market analysis.  Ultimately, Signet brought a motion to compel production of these documents, and the Court ordered Zeiss to make a due diligent search for the documents and state in a verified pleading that all such documents had been produced.  (Order, December 2, 2008 [Doc. 182]).  On March 12, 2009, the Court reiterated Zeiss's obligation to perform a due diligent search and make a verified pleading of compliance.  [Doc. 284.]

On March 17, 2009, Judge Sabraw dismissed the Amended Complaint for Zeiss's lack of standing, based in part on Zeiss's failure to produce a Quitclaim Assignment during discovery. [Doc. 286.]  The Court stated that "Plaintiffs' conduct . . . frustrated the search for truth [and] . . . there has been actual prejudice to Defendant, not just the risk thereof."  Furthermore, the Court held that Plaintiffs' conduct was sanctionable because it met the standard of "either willful or the fault of the offending party."  Judge Sabraw declined to dismiss the Complaint with prejudice, because lesser sanctions were available:

> Obviously, the impact of dismissal sanctions in this case is enormous. Plaintiffs would be precluded from filing another complaint, and unable to pursue their claims for infringement of the '713 Patent. Although this sanction would certainly deter Plaintiffs from engaging in similar conduct in the future, the Court may achieve the *same result through less drastic sanctions*. In this case, the Court finds those sanctions shall include an award of attorneys fees and costs incurred in investigating and litigating the standing issue. Plaintiffs' damages shall also be limited to those accruing after the new Complaint is filed. *If these sanctions prove to be inadequate, the Court will reconsider the propriety of dismissal sanctions.*

Id. at 7 (emphasis added).

On March 30, 2009, Zeiss filed the declaration of Karen Roberts, certifying under perjury that Zeiss conducted a diligent search and:  "To the best of my knowledge, all copies and any

1   duplicate in any form responsive to Signet Armorlite's requests have been printed and previously

2   produced."  [Doc. 291.]

3          The fact discovery cut-off in this case was August 28, 2009.

4   **B.      SIGNET'S ALLEGATIONS AND ARGUMENT**

5          On August 24, 2009, Signet deposed Claude Labeeuw, the Vice President of Marketing for

6   Carl Zeiss Vision Inc.  Based on Mr. Labeeuw's testimony, Signet alleges that Zeiss failed to

7   produce any of the following documents by the close of fact discovery:

8
        (1)     Any profit and loss statements for Carl Zeiss Vision, Carl Zeiss Vision
9               International, or Carl Zeiss Vision GmbH;

10       (2)     Documents describing the transfer of revenue from one Zeiss entity to another
                as a result of the sale of the lenses in question (or license fees from the patent
11              at issue);

12       (3)     Company-wide information regarding unit sales, gross sales, or profits related
                to sales of the lenses during the period from September 2008 to the present
13              (noting that the damages period begins on April 1, 2009);[1]

14       (4)     Documents reflecting consideration of licensing the subject patent with
                competitors; and
15
         (5)     Zeiss's position paper (on value of the subject patent) for the inventor
16              compensation arbitrations held before the German Patent Office.[2]

17   (Sig. Br. at 11-12.)  Furthermore, Signet states that it received insufficient information regarding

18   market share data and cost/margin data.  Id.

19          Following Mr. Labeeuw's deposition, Signet's counsel informed Zeiss's counsel that the

20   foregoing documents should have been produced.  Then, on August 31, 2009, one business day after

21   the close of fact discovery, Zeiss produced 731 pages of material, including much (but not all) of the

22   financial information listed above.  According to the slip sheets attached to the documents, most of

23   this financial information came from the files of Karen Roberts, who had stated by declaration on

24   March 30, 2009 that all responsive documents had already been produced.

25

26          [1] In his Order of March 17, 2009 [Doc. 286], Judge Sabraw ordered that Zeiss's potential
     recovery is limited to damages that accrue after the filing of its most recent Complaint, filed on April
27   1, 2009 (Case No. 09-cv-657-DMS (POR) [Doc. 1]).

28          [2] The parties have briefed the issue of the arbitration documents in more detail in the Motion
     for Sanctions for Spoliation of Evidence [Doc. 376].  Accordingly, the Court will address the issue in
     Section III of this Order.

1    Moreover, in the August 31, 2009 production, Zeiss, for the first time, identified four

2    products[3] allegedly covered by the '713 patent.  Zeiss never provided any damages discovery on

3    these products, and Signet alleges that Zeiss's damages expert relied on these four products in

4    rendering his October 13, 2009 expert report.  (Sig. Rep. Br. at 2.)

5        In its Supplemental Brief, Signet complains that on October 6, 2009, Zeiss produced 18 new

6    pages of documents, which alter financial data produced on August 31, 2009.  In particular, Signet

7    asserts that the 18 pages consist of two types of documents, which "contain new and different

8    information:"  (1) Freeform Reports; and (2) Click Fee Reports.  (Sig. Supp. Br. at 2-4.)

9        First, Signet argues that the latest Freeform Reports "changed the numbers and added new

10   columns and materials, further prejudicing Signet Armorlite's ability to meaningfully analyze

11   damage claims and prepare its experts."  Id. at 3.  Second, the new Click Fee Reports contain

12   increased amounts for nearly all the monthly "click fee" data for the various lenses, and include

13   totals for July 2009 (produced for the first time).  Id. at 3-4.

14       In sum, Signet asserts that Zeiss has willfully withheld the financial information until the

15   "11th hour and 59th minute" in order to prevent Signet from preparing for its depositions.  As a

16   result, Signet claims severe prejudice to its ability to develop a defense.

17   **C.     ZEISS'S ALLEGATIONS AND ARGUMENT**

18       First, Zeiss states that it fulfilled the Court's December 2, 2008 Order [Doc. 182] through

19   production of over 2,000 pages of documents on December 28, 2008.  For example, Zeiss claims

20   that it provided profit/loss statements for Carl Zeiss Vision for full year periods.[4]  (Zeiss Br. at 7.)

21   According to Zeiss, the August 2009 production contained only 91 additional documents, which

22   "supplemented and finalized its document production . . . ."  Id. at 4.

23       Second, Zeiss accuses Signet of similar withholding of financial information,[5] evidenced by

---

[3] These products are:  (1) Zeiss GT2 3D; (2) Zeiss GT2 3D Short; (3) Zeiss Individual; and (4) Reveal VSP VC FF.

[4] Zeiss does not provide a citation in support, however.

[5] Signet disputes this characterization and provides a lengthy addendum of exhibits demonstrating how Signet continuously provided the relevant financial data, beginning in August of 2008. (Sig. Rep. Br., Schnurr Decl. at ¶¶ 3, 6-10.)  Furthermore, Signet represents that Zeiss received the financial documents prior to the relevant depositions of Signet's witnesses. Id. at ¶ 11.

Signet's production of August 18, 2009, in which "Signet first provided the vast bulk of its financial records. . . ." Id. at 2.

Third, Zeiss claims that it served the documents at issue on August 28, 2009 via UPS Next Day Air, which complied with the discovery deadline, even though Signet did not receive the documents until Monday morning, August 31, 2009. Zeiss contends that Signet employed exactly the same delivery technique for its initial expert reports, due on September 28, 2009, but delivered by overnight courier the next day. Id. at 5.

Fourth, Zeiss states that "Signet never asked for certain documents," such as "back up detail for any such entity's profit and loss statements and supporting data for the product line profit and cost summaries." Id. at 7. Furthermore:

> during the course of preparing [the] opposition [to Signet's motion for sanctions], Zeiss again investigated the categories of documents that Signet contends were never produced. As a result, Zeiss recently identified potentially responsive documents and, after review, Zeiss will promptly produce those documents to the extent they exist for the period 2007 to date. Zeiss will make a Rule 30(b)(6) witness available for a deposition regarding those documents if Signet wants such a deposition.

Id. at 8. Zeiss also contends that it produced "hundreds of pages of arbitration documents," but upon being contacted by Signet, realized that approximately 10 pages of certain documents had not been produced. Again, Zeiss states that "[t]hese documents will be translated promptly and if they are not privileged, they will be promptly produced along with their translations." Id.

Lastly, in its Opposition to Signet's Supplemental Brief, Zeiss asserts that the latest Freeform Reports and Click Fee Reports, produced on October 6, 2009, were corrected versions of earlier produced documents. Specifically, Zeiss's Director of Product Marketing recently discovered errors in the Reports, corrected them, and Zeiss's counsel immediately produced the documents.

**D.      DISCUSSION**

Signet seeks sanctions under both Rule 37(b)(2) and Rule 41 of the Federal Rules of Civil Procedure.

Rule 37(b)(2) of the Federal Rules of Civil Procedure authorizes sanctions against a party who "fails to obey an order to provide or permit discovery" or who "fails to obey a [discovery] order entered under Rule 26(f)." Fed. R. Civ. P. 37(b)(2). Such sanctions may include: (i) directing that

matters embraced in the order or other designated facts be taken as established for purposes of the

action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or

opposing designated claims or defenses, or from introducing designated matters in evidence; (iii)

striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part; and (vi) rendering a default judgment

against the disobedient party.  Id.  Also, Rule 37(b)(2)(C) provides that "[i]nstead of or in addition to

the orders above, the court must order the disobedient party, the attorney advising that party, or both

to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure

was substantially justified or other circumstances make an award of expenses unjust."

As to dismissal under Rule 37(b)(2), the Ninth Circuit has held that "courts have inherent

power to dismiss an action when a party has willfully deceived the court and engaged in conduct

utterly inconsistent with the orderly administration of justice."  Fjelstad v. Am. Honda Motor Co.,

Inc., 762 F.2d 1334, 1338 (9th Cir. 1985).  However, dismissal is warranted only under "extreme

circumstances."  Fjelstad, 762 F.2d at 1338.

A court's use of sanctions is further limited by two standards.  "First, any sanction must be

'just;' second, the sanction must be specifically related to the particular 'claim' which was at issue

in the order to provide discovery."  Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,

456 U.S. 694 (1982).  Sanctions interfering with a litigant's claim or defenses violate due process

when imposed merely for punishment of an infraction that did not threaten to interfere with the

rightful decision of the case.  G-K Prop. v. Redev. Agency, 577 F.2d 645, 648 (9th Cir. 1978).

The Ninth Circuit has constructed a five-part test, with three subparts to the fifth part, to

determine whether a case-dispositive sanction under Rule 37(b)(2) is just: "(1) the public's interest

in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of

prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their

merits; and (5) the availability of less drastic sanctions."  See Connecticut Gen. Life Ins. Co. v. New

Images of Beverly Hills, 482 F.3d 1091, 1096 (9th Cir. 2007); see also Dahl v. City of Huntington

Beach, 84 F.3d 363, 366 (9th Cir. 1996)(applying same five factors to analysis of sanction under

Rule 41(b)).  The sub-parts of the fifth factor are whether the court has considered lesser sanctions,

1   whether it tried them, and whether it warned the recalcitrant party about the possibility of

2   case-dispositive sanctions.  Id.

3       Finally, the Court "may properly consider all of a party's discovery misconduct in weighing

4   a motion to dismiss, *including conduct which has been the subject of earlier sanctions*."  Payne v.

5   Exxon Corp., 121 F.3d 503, 508 (9th Cir. 1997)(emphasis added).

6       **1.    Financial Records**

7       Zeiss's production of financial records at the end of August 2009 frustrates the discovery

8   process.  Even if the Court construes the UPS Next Day Air shipment on August 28, 2009 as

9   "technically" within the close of discovery, the production raises two significant issues.  First,

10  Signet did not receive the financial documents–including "profit and loss statements" and "product

11  line sales reports" (Zeiss Br. at 2)–until *after* Signet's opportunity to depose Zeiss's Rule 30(b)(6)

12  witness on August 25, 2009.  Thus, Signet could not question the witness to test or confirm the data

13  contained in the documents.

14      Second, the August 2009 production contains documents that predate Zeiss's March 30,

15  2009 sworn declaration that "all copies and any duplicate in any form responsive to Signet

16  Armorlite's requests have been printed and previously produced."  [Doc. 291.]  For example, Zeiss

17  produced (1) annual income statements dating back to the fiscal year ending September 30, 2006

18  (Sig. Br., Ex. 2); (2) monthly revenues–by *lens product*–dating back to October 2008 (Sig. Br.,

19  Ex. 4); and (3) monthly data–by *lens product*–dating back to October 2008, which includes number

20  of lenses sold and cost of goods sold (Sig. Br., Ex. 23).  On December 2, 2008, this Court ordered

21  Zeiss to produce:

22          documents sufficient to show Zeiss's annual capacity to make . . . its actual sales in
            the United States of products allegedly embodying the invention of the '713 patent,
23          including, but not limited to Zeiss Gradal Individual, SOLAOne HD, SOLA Compact
            UltraTM HD and AO Easy HD lenses, in *units, gross sales and net profits*, from the
24          date of first such sale to the present.

25  (Order [Doc. 182] at 9)(emphasis added).

26      In light of the Court's Order and Zeiss's subsequent declaration that all relevant documents

27  had been produced, the content of Zeiss's August 2009 production demonstrates that Zeiss has

28  violated a valid court order and filed a false declaration.

## 2.    New Products

In its Third Supplemental Response to Signet's Interrogatory No. 1, served August 28, 2009, Zeiss added the following four products to the list of "products that now embody the invention of the '713 patent:"  (1) Zeiss GT2 3D; (2) Zeiss GT2 3D Short; (3) Zeiss Individual; and (4) Reveal VSP VC FF.  (Sig. Rep. Br., Ex. C)   Based on the record submitted, the Court cannot find any justification for the identification of these products on the final day of discovery.  As a result, Zeiss should be precluded from introducing any of these four products for any purpose.

## 3.    Freeform Reports and Click Fee Reports

With respect to the October 6, 2009 production of the Freeform Reports and Click Fee Reports ("the Reports"), there does not appear to be misconduct on the part of Zeiss.  On August 28, 2009, Zeiss produced the Reports to Signet.  Subsequently, Zeiss discovered errors in the Reports and obtained corrected versions from its Director of Product Marketing.  (Zeiss Supp. Br., Hiskey Decl. at ¶¶ 3-7.)  Zeiss then produced the corrected versions to Signet with a cover letter requesting that the latest versions "replace" the earlier versions.  (Sig. Br., Ex. A at 2.)

In response, on October 8, 2009, Signet moved for leave to file supplemental briefing for sanctions [Doc. 359] without engaging in a meaningful meet and confer with Zeiss.  For example, Signet highlights two pages in the production that were "INTENTIONALLY LEFT BLANK," insinuating that Zeiss had withheld information on these pages.  (Sig. Supp. Br. at 3.)  If Signet had followed the local rules to meet and confer with Zeiss regarding its concerns, Signet would have learned that Zeiss had merely changed the formatting from Portrait to Landscape, thus eliminating a waste of page space and reducing the total number of pages from four to two.  As a result, Zeiss inserted two pages "INTENTIONALLY LEFT BLANK" to preserve consistency in the Bates numbering.

In sum, Signet suffers from an itchy trigger finger and should be reminded to pursue a meaningful meet and confer–by either telephone or in-person–before shooting for sanctions.

## 4.    Recommendation

Based solely on the misconduct related to Signet's *First* Motion for Sanctions, it is RECOMMENDED that dismissal is not appropriate.  Instead, there are less drastic sanctions

available, and therefore, it is RECOMMENDED that Zeiss be precluded from relying on the

financial data produced at the very end of discovery.  Furthermore, it is RECOMMENDED that

Zeiss be precluded from deriving any damages from the four products identified for the first time on

August 28, 2009.  Also, it is RECOMMENDED that monetary sanctions be awarded for costs and

attorneys' fees, in accordance with proof,[6] associated with the filing of the instant motion [Doc.

351].

## II.  SANCTIONS MOTION – THIRD PARTY COMMUNICATIONS [DOC. 374]

On October 27, 2009, Signet filed under seal a "Motion for Sanctions Against [Zeiss] – Third

Party Communications."  [Doc. 374.]  The motion is fully briefed and ripe for adjudication.

In its motion, Signet alleges that Zeiss: (a) violated Court orders by withholding "key

customer contact documents" relevant to Signet's counterclaims for antitrust, unfair competition,

and interference with prospective advantage; and (b) filed false declarations asserting compliance

with the Court's discovery orders.  Based thereon, Signet requests the following sanctions:

(1) dismissal of Zeiss's Complaint with prejudice;

(2) default judgment on Signet's counterclaims for antitrust, unfair competition, and interference with prospective advantage; and

(3) monetary sanctions.

## A.    RELEVANT PROCEDURAL BACKGROUND[7]

Signet served a first set of interrogatories on Zeiss on October 5, 2007, including

Interrogatory No. 12:

Identify each person whom Zeiss . . . has contacted or has been contacted by regarding the '713 patent, the instant lawsuit, . . . and/or Signet Armorlite's Kodak Unique lenses, including, but not limited to, customers, potential customers, retailers, distributors, vendors and/or suppliers . . . .

(Sig. Br., Wynne Decl., Ex. 3 at 9.)  Also on October 5, 2007, Signet served its first set of

production requests, including Document Request No. 19, which requested communications

between Zeiss and its retailers, distributors, competitors, customers, or prospective customers

---

[6] In briefing the sanctions motions, Signet did not submit evidence of its costs and fees.

[7] This section supplements the Procedural Background set forth in Section I(A).

07cv894

1  concerning the subject matter of the '713 patent, this lawsuit, Signet, or the Kodak Unique lens.  On

2  December 2, 2008, the Court ordered Zeiss to produce these communications and state in a verified

3  pleading that all such documents had been produced.  (Order [Doc. 182], at 12.)  On March 30,

4  2009, Zeiss filed the following declaration, which applied generally to all document categories: "To

5  the best of my knowledge, all copies and any duplicate in any form responsive to Signet Armorlite's

6  requests have been printed and previously produced."  [Doc. 291.]

7         At the May 21, 2009 deposition of Zeiss's Rule 30(b)(6) witness, there was testimony

8  specific to the issue of communications between Zeiss and its customers.  In particular, the Rule

9  30(b)(6) witness, Karen Roberts, stated that it was her "understanding that Zeiss hasn't contacted

10  any customers or prospective customers about this lawsuit."  (Sig. Br., Wynne Decl., Ex. 5 at 283.)

11  Furthermore, when questioned about inquiries from customers regarding the lawsuit, Ms. Roberts

12  stated that "if there were any records [of the verbal inquiries], they would have been produced."  Id.

13  at 286.

14  **B.    SIGNET'S ALLEGATIONS AND ARGUMENT**

15         Signet claims that Ms. Roberts' declaration and deposition testimony are false.  In support,

16  Signet provides three primary examples of Zeiss's failure to identify communications responsive to

17  the discovery requests.

18         First, Signet alleges that Zeiss communicated with Co-Op Optical ("Co-Op"), a customer,

19  regarding Signet and the Kodak Unique lens.  Specifically, "Carl Zeiss Vision Inc.'s National Sales

20  Manager, Cheryl Vescio, sent Co-Op Optical documents supposedly setting forth the differences

21  between the SOLA/Zeiss backside lens and the Kodak Unique lens."  (Sig. Br. at 10.)  Furthermore,

22  Signet deposed Co-Op's Chief Operating Officer, who testified that Ms. Vescio informed Co-Op of

23  the litigation surrounding the Kodak lens at a time when Co-Op was performing due diligence on

24  whether to purchase Zeiss's lenses.  (Sig. Br., Wynne Decl., Ex. 8.)  Signet argues "[t]his is exactly

25  the type of information and documentation Signet Armorlite sought from Zeiss with Document

26  Request No. 19 and which Zeiss was ordered to produce by this Court's December 2, 2008 Order."

27  (Sig. Br. at 10-11.)  However, Zeiss never produced these communications, and thus, Signet was

28  //

07cv894

1    //

2    never able to depose Ms. Vescio.[8]

3         Second, Signet alleges that Zeiss sent documents to Vision Service Plan ("VSP") that

4    "compared Zeiss' backside lenses to others in the industry." Id. at 14.  Moreover, when subpoenaed,

5    VSP produced an industry comparison spreadsheet that highlights the "Patent Infringement Lawsuit

6    against Signet Armorlite."  (Sig. Br., Wynne Decl., Ex. 9.)  Again, Zeiss did not produce any

7    communications with VSP, and as a result, Signet claims that it was unable to conduct the

8    appropriate discovery with VSP.

9         Third, Signet alleges that Zeiss communicated with Satisloh North America ("Satisloh")

10   regarding the instant lawsuit.  On August 24, 2009, Signet deposed Claude Lebeeuw, Zeiss's Vice

11   President of Marketing and Business Development.  Mr. Lebeeuw testified that Satisloh's President

12   had communicated to Zeiss that "this lawsuit created an uncertainty for the people using this

13   [backside] technology."  (Sig. Br., Wynne Decl., Ex. 10.)  "Since Mr. Labeeuw was deposed four

14   days prior to the fact discovery cut-off, Signet Armorlite was denied this opportunity [to contact or

15   depose Satisloh]."  (Sig. Br. at 15.)

16   **C.     ZEISS'S ALLEGATIONS AND ARGUMENT**

17        Zeiss contends that "Signet has not identified a single communication produced by the five

18   subpoenaed third parties that is responsive to [Document Request No. 19, as modified by the Court's

19   Order of December 2, 2008]."  (Zeiss Br. at 3.)  Furthermore, Zeiss argues that "Signet's failure to

20   discover any evidence to support its [counter]claims is the result of its own lack of diligence." Id. at

21   5.  Also, Zeiss accuses Signet of withholding its own communications with customers until the very

22   end of discovery.

23        With respect to Co-Op, Zeiss identifies emails from early 2008 between Co-Op and Signet

24   that put Signet on notice that Co-Op was purchasing Zeiss lenses.  Zeiss argues that (1) this put

25   Signet on notice to do third party discovery, and (2) Signet "buried" these emails until the end of the

26

27        [8] Signet discovered these communications by contacting Co-Op in the course of due diligence
28   and subpoenaing the documents directly.  Signet points out that contacting its customers in this fashion
     "republish[es] the false allegations made by Zeiss," but was necessary due to Zeiss's failure to produce
     the documents.

1    discovery period.  Moreover, Zeiss quotes the deposition testimony of Co-Op's representative,

2    which states that (a) Ms. Vescio (Zeiss) did not inform Co-Op that Zeiss's lens was a patented

3    product and (b) Zeiss did not use the litigation "to try and influence [Co-Op's] decision to drop

4    Kodak Unique lenses."  (Zeiss Br., Ex. F at 50-51, 140.)

5         With respect to VSP, Zeiss makes two arguments.  First, Zeiss quotes the deposition

6    testimony of VSP's President that the conversation between Zeiss and VSP concerning the litigation

7    amounted to "one sentence" of how Zeiss was protecting its rights.  (Zeiss Br. at 9.)  Second, Zeiss

8    claims that "Signet sandbagged Zeiss with VSP related documents" 10 days before the close of

9    discovery, including email exchanges between Signet and VSP explaining why VSP did not choose

10   Signet for providing a progressive lens.  Id.

11        Finally, Zeiss requests attorney fees for the costs incurred in responding to this Motion.

12   **D.     DISCUSSION**

13        On December 2, 2008, addressing Signet's Document Request No. 19, the Court ordered

14   Zeiss to produce communications between Zeiss and its retailers, distributors, competitors,

15   customers, or prospective customers "regarding the subject matter of the '713 patent *as it relates to*

16   *the instant action, Signet Armorlite and/or Signet Armorlite's Kodak Unique lenses.*"  (Order [Doc.

17   182] at 12)(emphasis in original).  Furthermore, on October 5, 2007, Signet served Zeiss with

18   Interrogatory No. 12, which requested that Zeiss identify customers whom Zeiss had contacted, or

19   who had contacted Zeiss, "regarding the '713 patent, the instant lawsuit, . . . and/or Signet

20   Armorlite's Kodak Unique lenses. . . ."  (Sig. Br., Wynne Decl., Ex. 3 at 9.)

21        **1.     Co-Op**

22        Signet contacted prior customers, including Co-Op's Chief Operating Officer, Charles

23   Benson, who testified regarding communications with Zeiss:

24        Q:    Did Ms. Vescio ever mention to you that the Carl Zeiss product was a patented
              product?
25
          A:    I don't remember her saying that to me, no.
26

27        . . .

28        Q:    How do you know now [that the products are patented]?

- 12 -

1  A:   Just from the documentation that I received via the subpoenas.

2  (Zeiss Br., Ex. F at 50-51.)  Additionally:

3  Q:   Did Cheryl Vescio or anyone from Carl Zeiss ever say anything to you about this
       litigation or Signet infringing a patent in order to try to and influence your decision to
4      drop Kodak Unique lenses?

5  A:   No.

6
   (Id. at 140.)  Later in the same deposition, however, Mr. Benson testified as follows:
7

8  Q:   And how about Carl Zeiss, who did you hear it from from Carl Zeiss that there was a
       potential litigation on the horizon?
9
   A:   Heard it from Cheryl Vescio.
10

11     . . .

   Q:   Do you remember when it was you spoke to Cheryl about it?
12

13     . . .

   A:   It – that would have been at the time I was doing some due diligence about the whole
14      process [of selecting backside progressive lenses].

15     . . .

16 Q:   Okay.  What did Cheryl say about litigation?

17 A:   Just that, obviously, there was going to be some litigation, that Signet Armorlite was
       producing a design that they – that they had technology or they were producing in
18      their European operation, and that somehow potentially maybe Kodak got a hold of
       that technology and brought it to the U.S.
19
   (Sig. Br., Ex. 8 at 109.)  Furthermore:
20

21 Q:   Did you ever have any discussions with anybody at Carl Zeiss Vision as to, you
       know, the comparison between the two different lenses?
22
   A:   Between the Kodak Unique and the SOLA HDV?
23
   Q:   Yes.
24
   A:   With someone at Carl Zeiss Vision?
25
   Q:   Yes.
26
   A:   Yes.
27
   Q:   Would that be Cheryl Vescio?
28
   A:   Yes.

1   (Id. at 117.)  Based on the foregoing, the scope of communications between Zeiss and Co-Op is not

2   clear, but the testimony demonstrates that Zeiss discussed its lenses in conjunction with Signet's

3   Kodak lenses and "some litigation."  Thus, if documentation of these communications exists, Zeiss

4   violated a valid court order by failing to produce such documentation.  Even if documentation does

5   not exist, however, Zeiss's failure to disclose communications responsive to Signet's Interrogatory

6   No. 12 merits sanctions.

7          **2.     VSP**

8          With respect to Document Request No. 19, the Court cannot find sufficient evidence of

9   written communications between Zeiss and VSP regarding the patented lenses as they relate to the

10  instant action, Signet, or Signet's Kodak Unique lenses.  The spreadsheet submitted by Signet was

11  created by VSP, and no documentation of the alleged emails appears in the record.  Thus, the Court

12  cannot identify any misconduct on the part of Zeiss with respect to VSP-related written discovery.

13         Although the Court finds there is insufficient evidence of undisclosed *written*

14  communications between Zeiss and VSP, the record demonstrates that Zeiss and VSP had a brief

15  *oral* conversation about this litigation.  (Zeiss Br. at 9 and Ex. I.)  Specifically, VSP's President of

16  Ophthalmic Operations recalls that the discussion of the litigation was "one sentence."  (Zeiss Br.,

17  Ex. I at 93.)  Despite the brevity of the discussion, however, this contact between Zeiss and a

18  customer regarding the litigation requires a response to Signet's Interrogatory No. 12.  Accordingly,

19  Zeiss's failure to disclose the communication merits sanctions.

20         **3.     Satisloh**

21         On August 24, 2009, Claude Lebeeuw, Zeiss's Vice President of Marketing and Business

22  Development, testified that Satisloh's President had communicated to Zeiss that "this lawsuit created

23  an uncertainty for the people using this [backside] technology."  (Sig. Br., Wynne Decl., Ex. 10.)

24  Based on this uncontradicted testimony, the Court finds that a third party contacted Zeiss regarding

25  this litigation and further finds that this communication falls within the scope of Signet's

26  Interrogatory No. 12.  Accordingly, Zeiss's failure to disclose the communication merits sanctions.

27         **4.     Recommendation**

28         It is RECOMMENDED that Zeiss's failure to disclose its communications with Co-Op, VSP,

and Satisloh should not warrant, on its own, dismissal of Zeiss's Complaint or judgment entered on

Signet's counterclaims.  However, it is RECOMMENDED that monetary sanctions be awarded for

costs and attorneys' fees, in accordance with proof, associated with the filing of the instant motion

[Doc. 374] and Signet's efforts to pursue its own discovery with Co-Op, VSP, and Satisloh.

### III. SANCTIONS MOTION – SPOLIATION OF EVIDENCE [DOC. 376]

On October 27, 2009, Signet filed under seal a "Motion for Sanctions Including Dismissal of

Plaintiffs' Complaint for Spoliation of Evidence and Other On-Going Litigation Misconduct."  [Doc.

376.]  The motion is fully briefed and ripe for adjudication.

In its motion, Signet alleges that Zeiss:

(a) withheld "the tests and other factual bases for the statements made by other Zeiss employees under oath in other patent applications co-pending with the '713 patent;"

(b) never produced "the inventors' personal files supplied to Zeiss' trial counsel in January 2007;"

(c) unduly delayed production of Zeiss's German arbitration responses (from 2007), which "directly contradict Zeiss' patentability and infringement contentions in this action;"

(d) never produced the "exact amount that Zeiss paid the '713 patent inventors in the form of a patent royalty for use of the '713 patent;" and

(e) made false deposition testimony and filed false declarations regarding knowledge of the aforementioned documents.

(Sig. Br. at 2-3.)  Based thereon, Signets requests that this Court do at least one of the following:

(1) dismiss Zeiss's Complaint; and/or

(2) enter judgment on Signet's counterclaims.

### A.    SIGNET'S ALLEGATIONS AND ARGUMENT

First, Signet claims that Zeiss withheld documents relevant to its Counterclaim of inequitable

conduct.  Specifically, Signet alleges that Zeiss failed to inform the '713 patent examiner that the

'713 patent subject matter had problems, even though Zeiss had represented in its application for the

'106 patent that the '713 patent subject matter "result[s] in excessively thick spectacle lenses and the

imaging quality of the spectacle lenses is in need of improvement."  (Sig. Br., Schnurr Decl., Ex. A

at 2.)  With respect to the present Motion, Signet asserts that the tests and factual bases underlying

this representation have not been produced.  Under the applicable case law, the quoted statement of defect in the patent application amounts to "an affirmative representation that these tests were actually performed. . . ."  (Sig. Br. at 9.)  According to Signet, this creates a trilogy of possibilities: (1) if Zeiss never performed such tests, the failure to do so amounts to inequitable conduct; (2) if Zeiss has lost the tests, then spoliation law dictates sanctions; and (3) if Zeiss is in possession of the tests, then the withholding of the tests amounts to a violation of the December 2, 2008 Court Order.

Second, Signet claims that Zeiss violated Local Patent Rule 3.2b (and Court's Order of November 14, 2007 [Doc. 40]) by failing to produce the personal files of the inventors as they relate to the "inventors' problems and failures relative to the *reduction to practice* of the [patent]. . . ." (Sig. Br. at 13)(emphasis added).

Third, Signet complains that Zeiss produced arbitration documents directly relevant to a central issue in the case–whether Zeiss's lenses are "individually optimized"–on August 24, 2009, near the close of fact discovery.  Furthermore, the documents were produced in German and in redacted form, in violation of court order.  Also, Signet argues that the redactions are improperly based on entries listed in Zeiss's untimely Eighth Privilege Log.

Fourth, Signet argues that Zeiss failed to produce the arbitration documents that relate to the compensation paid to the inventors for use of the '713 patent subject matter.  This information is relevant to the damages issue of the reasonable royalty rate.  Signet interprets emails between the parties as an admission by Zeiss that Zeiss has lost the documents in question.  Thus, Signet argues under the spoliation case law that such a failure to preserve evidence merits dismissal of the action.

Fifth, Signet points out that the failure to produce the aforementioned documents demonstrates that Zeiss's earlier verifications by declaration and deposition testimony were false.

**B.      ZEISS'S ALLEGATIONS AND ARGUMENT**

First, Zeiss refutes the accusation that it withheld "defects" from the U.S. patent examiner. Zeiss argues that the statements concerning the lens thickness and imaging quality "have no bearing on the validity of the invention."  (Zeiss Br. at 5).  Furthermore, Zeiss claims the statements served to "distinguish the invention of the '106 patent from prior art."  Id. at 6.  Regardless, Zeiss states that it searched all client files and confirmed that no test data documents are in Zeiss's possession.

1       Second, with respect to the inventors' efforts to reduce the patent to practice, Zeiss claims

2   that Signet improperly relies on "two pages in the arbitration documents" to extrapolate a conclusion

3   that such efforts were "failures." Id. at 7. To the contrary, Zeiss cites deposition testimony for the

4   proposition that early cost problems related to "polishing and surface add-ons" were solved. Id.

5   Moreover, Zeiss claims that "[a]ll documents relating to any cost add-on and polishing problems

6   were produced in response to Signet's document request." Id.

7       Third, Zeiss argues that the redactions are properly listed on the privilege log, which was

8   timely in light of the parties' pattern and practice of updating privilege logs throughout the litigation.

9       Fourth, with respect to the documents concerning inventor compensation, Zeiss states that

10   (1) arbitration documents describing inventor compensation were produced to Signet; (2) Signet had

11   the opportunity to depose Klaus Gnatzig, the Rule 30(b)(6) witness for inventor compensation and

12   arbitration documents, in August 2009; and (3) "Signet does not understand the arbitrated mediation

13   process [in Germany] . . . and the 1% royalty rate proposed by Zeiss to the mediators of the German

14   arbitration proceeding cannot be compared with a 10% reasonable royalty rate under United States

15   patent law." Id. at 13. Also, Zeiss interprets spoliation law to impose the sanctions requested by

16   Signet only when documents have been destroyed or altered–not merely lost.

17       Fifth, Zeiss accuses Signet of misleading the Court regarding the date when Signet actually

18   requested the compensation information. According to Zeiss, Signet first requested this information

19   on March 17, 2009 in its Fifth Discovery Request. Id. at 14. Also, Ms. Roberts was incorrectly, and

20   inadvertently, listed as the source of all the documents relevant to damages.

21       Finally, Zeiss cites Keithley v. Homestore.com, 2008 WL 4830752 (N.D. Cal., Nov. 6,

22   2008), for the proposition that when a party moves for a dismissal sanction before requesting an

23   extension of the discovery deadline, the motion must be denied.

24  **C.**     **DISCUSSION**

25       **1.**     **Inequitable Conduct – Failure to Disclose Defects to U.S. Patent Examiner**

26       On August 24, 2009, Zeiss produced arbitration documents to Signet in German language

27   form, which included the following statement by Zeiss to the German patent examiner:

28       The known spectacle lens has been found to be disadvantageous in so far as the

> common manufacture of spectacle lenses of specific different combinations of
> eyesight deficiencies result in excessively thick spectacle lenses and the imaging
> quality of the spectacle lenses is in need of improvement.

(Sig. Br., Ex. A at col. 1-2.)  Whether Zeiss's alleged failure to makes this same statement to the

U.S. patent examiner constitutes "inequitable conduct," as alleged by Signet's Counterclaim III, is

for a trier of fact to decide.  With respect to the instant sanctions motion, the Court finds the

document is discoverable, and notes that Zeiss produced the document, albeit in German and four

days before the close of discovery.

The central issue is whether Zeiss has withheld the test data underlying the statement quoted

above.  In declarations, the inventors represent that all documents in their files relating to the image

quality and thickness of the lenses had been transferred to Zeiss's counsel for production in this

case.  (Zeiss Br., Exs. B, C.)  Furthermore, when deposed, one of the inventors took responsibility

for the statement quoted above, but did not "recall any specific tests or measurements [regarding

image quality or thickness of the lenses]."  (Sig. Br., Ex. X at 100.)  The inventor stated that he used

a "S5 optimization program . . . to calculate these lenses" but did not "recall any specific records to

that effect."  Id. at 101.  Based on the submitted record, the Court cannot conclude that Zeiss has

withheld any test data.

### 2.    Inventors' Personal Files

Local Patent Rule 3.2(b) requires each party to produce "[a]ll documents evidencing the

conception, reduction to practice, design, and development of each claimed invention, which were

created on or before the date of application for the patent in suit . . . ."  One of the inventors of the

patent at issue stated in an arbitration document that the inventors did not receive "support" from the

company "until the time of submitting the invention application."  (Sig. Br., Schnurr Decl., Ex. I(1)

at 3.)  "To the contrary, some of the developments were even made during our free time [and] I even

made private investments in programs and computers."  Id.  Thus, it is possible that invention

development documents exist, but based on the record, the Court cannot be sure.  Specifically, Zeiss

fails to identify actual disclosure of such documents, and Signet can only speculate as to the specific

content of the inventors' personal files.

If Zeiss is indeed withholding the inventors' development files for the period preceding the

1   patent application (January 16, 1997), such misconduct would merit serious sanctions.  For example,

2   on November 15, 2007, the Court instructed and warned Zeiss:

> Plaintiffs are further instructed to reinspect the documents in their possession to
> ensure that they have produced all non-privileged documents evidencing the
> conception, reduction to practice, design, and development of the claimed invention,
> created on or before January 16, 1997.  The Court is wary of Plaintiffs' broad denial
> of the relevance of documents that are in their possession because the parties
> represented to this Court at their Early Neutral Evaluation conference that Plaintiff
> has previously litigated the European patent of this same invention.  The Court
> cautions Plaintiffs' counsel that any relevant documents wrongly withheld during
> discovery may subject them, as well as their clients, to sanctions.

8   (Order [Doc. 40] at 3-4.)  Based on the submitted record, however, the Court finds no evidence that

9   the alleged contents of the inventors' files are in possession of Zeiss.  Thus, the Court

10  RECOMMENDS denying sanctions on this issue without prejudice.

11          **3.      Arbitration Documents**

12          On October 5, 2007, Signet served its first set of document requests, including Document

13  Request No. 18:

> All documents referring or relating to any action, lawsuit or other proceeding,
> whether in the United States or foreign, involving [the patents at issue] and/or any
> patent and patent application related thereto, whether pending or settled, inter partes
> or ex parte, before a civil court, foreign court, the United States Patent and
> Trademark Office, or other administrative body.

17  (Sig. Br., Ex. D at 10-11.)  On July 23, 2008, the Court ordered that "responses to all requested

18  discovery shall be produced on or before July 30, 2008."  (Order [Doc. 107] at 1.)  Zeiss, however,

19  did not produce the arbitration documents at issue until August 24, 2009, even though the two

20  documents highlighted by Signet were dated September 5, 2007 and September 7, 2007,

21  respectively.  (Sig. Br., Exs. L, M.)  Furthermore, Zeiss produced the documents in German, without

22  translation, and with substantial redactions.

23          Although the timing and nature of this production might not merit sanctions on its own, when

24  viewed in conjunction with Zeiss's other misconduct, the production further supports that sanctions

25  are appropriate.

26          **4.      Inventor Compensation Arbitration Documents**

27          Once litigation is anticipated, "a litigant is under a duty to preserve evidence which it knows

28  or reasonably should know is relevant to the action."  In re Napster, Inc. Copyright Litig., 462 F.

Supp. 2d 1060, 1067 (N.D. Cal. 2006); see also A. Farber & Partners, Inc. v. Garber, 234 F.R.D. 186, 193 (C.D.Cal.2006).  If a party breaches its duty to preserve the evidence, a court may sanction the party for destroying the evidence.  Napster, 462 F. Supp. 2d at 1066 (citing Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp., 982 F.2d 363, 368 (9th Cir.1992)).  The arbitration documents at issue originate from late 2007, after Zeiss filed its original Complaint against Signet.  Thus, Zeiss had a "duty to preserve" the arbitration documents "relevant to the action," including documents demonstrating the method of calculating inventor compensation.  Zeiss, however, "could not locate" the two arbitration documents at issue.  (Zeiss Br. at 10.)

Thus, the issue becomes whether the misplacement or loss of documents merits the dismissal sanctions demanded by Signet.  Under Ninth Circuit precedent, a "party's destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions."  Napster, 462 F. Supp. 2d at 1066 (citing Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir.1993)).  At the same time, "a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed."  Id. at 1066-67.  The Northern District of California has applied this principle to the specific situation of "lost" documents.  See Keithley v. Homestore.com, Inc., 2008 WL 4830752 (N.D. Cal., Nov. 6, 2008).  In Keithley, Plaintiffs conceded that the attachments to several discoverable emails could not be located.  The court stated that Defendants had "not shown that Plaintiffs destroyed, rather than simply lost, these documents for purposes of the severe sanctions for spoliation that Defendants seek."  Id. at *8.  Instead, the court found the conduct "negligent" and held that "monetary sanctions are sufficient."  Id. at *8-10.

Similarly, Zeiss's failure to produce the two arbitration documents related to inventor compensation does not merit a "severe" sanction, such as dismissal.  First, there is no evidence that Zeiss destroyed the documents.  Second, Zeiss provided a Rule 30(b)(6) witness, Klaus Gnatzig, to address the calculation of inventor compensation:

> Q:  With respect to the '713 patent family, what royalty rate was used in the compensation offer that Zeiss was obligated to make with respect to the law apparently concerning its relations with its employees?
>
> A:  As far as I know, a fictitious licensing fee of 1% based on the net sales price was used as a basis. . . .

1   (Sig. Br., Ex. Q at 63.)  Based on the foregoing, the Court finds that dismissal sanctions would be

2   disproportionately harsh relative to Zeiss's "degree of fault."

3        This is not to say, however, that Zeiss is without fault.  To the contrary, in addition to failing

4   to preserve and locate the two arbitration documents at issue, Zeiss employed gamesmanship in its

5   production of other arbitration documents.  Specifically, Zeiss did not produce any arbitration

6   documents relative to inventor compensation until August 24, 2009, 11 days *after* Signet's

7   deposition of Mr. Gnatzig.  Accordingly, sanctions are appropriate.

8        **5.      Recommendation**

9        Based on the nature and timing of Zeiss's disclosure of arbitration documents, it is

10  RECOMMENDED that monetary sanctions be awarded for costs and attorneys' fees, in accordance

11  with proof, associated with the filing of the instant motion [Doc. 376] and the deposition of Mr.

12  Klaus Gnatzig.

13        **IV.  SANCTIONS MOTION – ONGOING MISCONDUCT [DOC. 379]**

14       On November 2, 2009, Signet filed under seal a "Motion Evidencing Plaintiffs' On-Going

15  Misconduct and Seeking Order Prohibiting Plaintiffs From Using Documents Produced on October

16  29, 2009." [Doc. 379.]  The motion is fully briefed and ripe for adjudication.

17       In its motion, Signet alleges that Zeiss produced money transfer documents relevant to

18  damages on October 29, 2009, two months after the close of discovery.  Signet requests that the

19  Court (1) prohibit Zeiss from using these documents and (2) consider Zeiss's conduct in conjunction

20  with the other pending sanctions motions.

21  **A.      SIGNET'S ALLEGATIONS AND ARGUMENT**

22       On October 13, 2009, Signet's damages expert delivered his expert report, which stated that

23  no documents were produced showing the flow of money between the various Zeiss entities.  On

24  October 29, 2009, Zeiss produced 42 pages of documents, which Signet characterizes as

25  "purportedly relat[ing] to money transfers between the various Zeiss entities."  (Sig. Br. at 1.)

26  Signet also asserts that the documents are vague and lack clear identification, but because the

27  discovery deadline has passed, Signet is unable to acquire more detail.

28       Signet argues that the money transfer documents had been clearly requested by the

1  following:

2     DOC. REQUEST NO. 147: ". . . the payment of royalties . . . including, but not
       limited to, the allocation of any royalties between any Zeiss companies or with any
3     third party."

4     DOC. REQUEST NO. 150: " . . . allocations of revenues or expenses between named
       Plaintiffs and any other Zeiss company or third party . . ."
5

6  (Sig. Br., Wheeler Decl., Ex. 3 at 4-5.)  According to Signet, Zeiss responded by saying that any

7  responsive non-privileged documents "will be produced by the close of fact discovery, or January

8  19, 2009."  (Sig. Br. at 4.)

9     Furthermore, Signet requested "documents relating to . . . income transferred to Carl Zeiss

10 Vision GmbH relating [to the '713 patent] . . . and how such monies were distributed within Zeiss."

11 Id. at 5 (citing Doc. Requests Nos. 202, 220).  Zeiss responded to the document requests by stating

12 that the documents had already been produced.  Signet argues that the latest production of October

13 29, 2009 proves that Zeiss's responses were false.

14    Signet argues that the prejudice is obvious.  Signet's damages expert was not able to review

15 these documents in preparing the expert report, but Zeiss's damages expert can, and will.

16 **B.     ZEISS'S ALLEGATIONS AND ARGUMENT**

17    First, Zeiss argues that the documents are not responsive to Signet's document requests,

18 because the money transfers "pertain to Carl Zeiss Vision, Inc. as a whole and not *per se* to products

19 or processes covered by the patent-in-suit." (Zeiss Br. at 3.)  Instead, Zeiss produced the documents

20 only "out of an abundance of caution", because Zeiss's damages expert relied on excess cash

21 transfers to make his report, submitted October 13, 2009.  Specifically, the expert learned of the

22 transfers from discussions with Zeiss's CFO, not from the documents.  In fact, Zeiss states that the

23 damages expert has not seen–and never will see–the documents produced to Signet on October 29,

24 2009.

25    Second, upon producing the documents to Signet, Zeiss "offered to stipulate to an extension

26 of time for Signet's supplemental expert report on damages."  Id.  Signet did not accept this

27 stipulation, and instead, filed the present motion for sanctions.  (Zeiss Br., Ex. D.)

28    Third, in its brief, Zeiss represents that it will not "rely on such documents at trial unless the

1   Court decides that such documents are available for use in this litigation."  (Zeiss Br. at 3.)

2

3   **C.     DISCUSSION**

4            Zeiss's production of fund transfer documents on October 29, 2009 demonstrates ongoing

5   litigation misconduct.  First, prior to the October 29, 2009 production, Zeiss had not produced *any*

6   documents responsive to Signet's request for documentation of "allocations of revenues or expenses

7   between named Plaintiffs and any other Zeiss company or third party, relating to the '713 patent, the

8   '470 patent . . . ."  (Sig. Br., Ex. 3 at 5.)  Second, upon careful review of Zeiss's production of

9   October 29, 2009, the Court finds that the documents identify money transfers, but the recipients are

10  not clearly identified, and the descriptions of the funds lack the detail necessary for a meaningful

11  analysis ("excess cash," "interest income," and operations funding").  (Sig. Br., Ex. 2 at 11-14.)

12  Even though these "excess cash" transfers may not appear "relat[ed] to the '713 patent [or] the '470

13  patent" on their face, discovery as to these transfers could reveal more detail, especially upon

14  deposition of an individual familiar with the transfers.  By producing the first glimpse of money

15  transfers two months after the close of fact discovery, however, Zeiss effectively denied Signet the

16  opportunity to pursue such detail.

17           Even more disturbing, Zeiss's damages expert found that the transfers of "excess cash"

18  supports Zeiss's claim for lost profits.  Specifically, in his report, the expert states, "As I understand

19  it, all of the profits earned by CZV Inc. flow to CZV International GmbH."  (Zeiss Br., Ex. A at 20.)

20  The report cites a "conversation with CZV personnel," rather than the documents, but the bottom

21  line remains the same:  Zeiss relies on the flow of money between entities to establish lost profits,

22  and Zeiss did not produce *any* discovery on this flow of money until two months after the close of

23  fact discovery.

24           Furthermore, Zeiss's overture of self-remedy is misleading and disingenuous.  In particular,

25  "Zeiss does not intend to give [Zeiss's expert] the documents produced on October 29, 2009, nor

26  does Zeiss intend to rely on such documents at trial unless the Court decides that such documents are

27  available for use in this litigation."  (Zeiss Br. at 3.)  First, Zeiss's decision to forego reliance on the

28  documents is conditional.  Second, and more importantly, Zeiss does not offer to strike the section of

its expert's report that relies on the transfers of excess cash between the business entities.

In light of fairness and the interests of justice, it is RECOMMENDED that Zeiss be precluded from relying on the money transfers for any purpose in this case. Additionally, it is RECOMMENDED that monetary sanctions be awarded for costs and attorneys' fees, in accordance with proof, associated with the filing of the instant motion [Doc. 379].

## V. CONCLUSION AND RECOMMENDATION

"If there is a hell to which disputatious, uncivil, vituperative lawyers go, let it be one in which the damned are eternally locked in discovery disputes with other lawyers of equally repugnant attributes." Dahl v. City of Huntington Beach, 84 F.3d 363, 364 (9th Cir. 1996). Counsel continue to fail themselves, fail this Court, and fail their clients by treating the discovery process as a forum for gamemanship, spiteful rhetoric, and the proliferation of unnecessary paper.

After the Court's careful review of the motions, the parties' filings related thereto, and the applicable case law, it is hereby RECOMMENDED that Signet's motions for sanctions be GRANTED, in part, and DENIED, in part, as follows:

(i)     With respect to the Motion for Sanctions [Doc. 351], it is RECOMMENDED that (1) Zeiss be precluded from relying on the financial data produced at the very end of discovery; (2) Zeiss be precluded from deriving any damages from the four products identified for the first time on August 28, 2009; and (3) monetary sanctions be awarded for costs and attorneys' fees, in accordance with proof, associated with the filing of the motion.

(ii)    With respect to the Motion for Sanctions – Third Party Communications [Doc. 374], it is RECOMMENDED that monetary sanctions be awarded for costs and attorneys' fees, in accordance with proof, associated with the filing of the motion and Signet's efforts to pursue its own discovery with Co-Op, VSP, and Satisloh.

(iii)   With respect to the Motion for Sanctions – Spoliation of Evidence [Doc. 376], it is RECOMMENDED that monetary sanctions be awarded for costs and attorneys' fees, in accordance with proof, associated with the filing of the

1    motion and the deposition of Mr. Klaus Gnatzig.

2        (iv)    With respect to the Motion for Sanctions – Ongoing Misconduct [Doc. 379], it

3                  is RECOMMENDED that (1) Zeiss be precluded from relying on the money

4                  transfers for any purpose in this case; and (2) monetary sanctions be awarded

5                  for costs and attorneys' fees, in accordance with proof, associated with the

6                  filing of the motion.

7    This Report and Recommendation of the undersigned Magistrate Judge is submitted to the

8    United States District Court Judge assigned to this case, the Honorable Dana M. Sabraw, pursuant to

9    the provisions of 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c)(1).

10    IT IS HEREBY ORDERED that no later than **February 5, 2010**, any party may file and

11    serve written objections with the Court and serve a copy on all parties.  The document should be

12    captioned "Objections to Report and Recommendation."

13    IT IS FURTHER ORDERED that any reply to the objections shall be filed and served no

14    later than **February 12, 2010**.  The parties are advised that failure to file objections within the

15    specified time may waive the right to raise those objections on appeal of the Court's order.  Martinez

16    v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

17    IT IS SO ORDERED.

18

19    DATED:  January 21, 2010

20

21    _____
    LOUISA S PORTER

22        United States Magistrate Judge

23

24    cc       The Honorable Dana M. Sabraw
           All parties

25

26

27

28